**UNITED STATES DISTRICT COURT**
**FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEVIN WUTHERICH, | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICE ENERGY INC, a.k.a | ) | |
| EQT RE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

JURY TRIAL DEMANDED

COMPLAINT IN CIVIL ACTION

The Plaintiff, Kevin Wutherich, by his attorney Daniel W. Ernsberger and the law firm of

Behrend and Ernsberger, presents the following complaint in civil action and avers as follows:

Jurisdiction and Venue

1.      This case arises, in part, under federal statutes including the Sarbanes-Oxley Act of 2002,

18 U.S.C.1514A. The Dodd-Frank Act  15 U.S.C. § 78u-6(h),  Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq.. and the  Age Discrimination

in Employment Act, 29 U.S.C § 623. Therefore, this court has original jurisdiction of this

matter pursuant to 28 U.S.C. § 1331.

2.      Jurisdiction over the Defendant exists because the Defendant in this litigation is present
        and operating within the jurisdictional limits of the Washington County Pennsylvania,

3.      Venue is proper because the employment relationship between Plaintiff and Defendant
        that gave rise to some of the claims in this litigation was directed, and ultimately
        terminated, by employees of Defendant within this judicial district and most or all of the
        wrongful acts and omissions complained of in this litigation took place in the Western
        District of Pennsylvania.


<u>The Parties</u>


4.      The Plaintiff, Kevin Wutherich, is an individual who resides at 1766 Hastings Mill Road,
        Pittsburgh, PA 15241.  Mr. Wutherich is over 40 years old and Canadian.  He is a green
        card holder.


5.      The Defendant, Rice Energy  is located at 2200 Rice Drive, Canonsburg, PA 15317.
        Defendant Rice Energy is a publically traded corporation registered with the Securities
        Exchange Commission. Defendant's corporate shares are traded on the New York Stock
        Exchange.  The Defendant, Rice Energy, is also known as EQT RE LLC.

Introduction

6.      Mr Wutherich was hired by Rice Energy in May of 2015.

7.      Mr. Wutherich was  Director of Completions. He worked a standard 8-5 p.m. schedule

during the week. He was given freedom to adjust his schedule as needed.  He received an

annual salary of approximately $210,000 plus stock and cash bonuses.

8.      As Director of Completions, Mr Wutherich was in charge of running the operations of the

completions department. The completion department consisted of approximately 10

people, all of who reported through Mr. Wutherich directly/indirectly.

9.      Mr. Wutherich was in charge of everything from personnel, safety, process evaluations,

software evaluation the other aspects of running the department. Once a gas well is drilled

and completed, the completions department is in charge of connecting the well bore to the

reservoir which includes hydro fracturing.

10.     Mr. Wutherich reported to Tunde Ajayi (Vice President of Completions) who in turn

reported to Toby Rice (Founder/CEO/President).

11.     At the time he was hired, Rice Energy knew that Mr. Wutherich had other business

interests

        a.      The employment agreement was specifically amended to provide for Mr.

                Wutherich's continued research and development of Hydraulic Fracturing

                technology and his receipt of additional compensation over and above his salary

                and stock bonus; and

        b.      It was also agreed, and specifically included in the employment agreement, that

Mr. Wutherich could pursue his own business opportunities provided that he had prior approval of the Company.

c.  Eventually, Mr Wutherich did work with a company called Drill2Frac.

d.  Mr. Wutherich disclosed his business plans to Tunde Ajayi or Toby Rice or both and obtained approval prior to working with Drill2Frack.

<u>Concise narrative of the facts</u>

12.  Mr. Wutherich received training Sarbanes-Oxley and the rules that fall under the SEC concerning the bidding process when he worked for a previous employer around 2013.

13.  Mr. Wutherich was also familiar with the use and abuse of interlocking interests among corporations, because

a.  He used them properly to exchange information as needed and

b.  Understood how they could be abused.

14.  While at Rice Energy, he observed unfair bidding practices, abused interlocking interests, and other illegal practices.

15.  Based on his training he reasonably believed that the practices at Rice Energy had violated Sarbanes-Oxley and the rules that fall under the SEC

16.  He reported the irregularities to his supervisor Tunde Ajayi (VP of Completions), COO Toby Rice, and others.

17.  He was a whistle blower and he was terminated because of his whistleblowing.

18.  There were two whistleblowing events; the first involving Silver Creek Services and the

second involving EOG resources.

Silver Creek Services

19.     Rice Energy has stock listed on New York Stock Exchange.

20.     As part of its fiduciary responsibilities to shareholders Rice Energy issues proxy

        statements and other SEC materials.   The 2016 Proxy Statement informed shareholders

        of its policy and  practice concerning certain pre-approved or ratified related party

        transactions.

> Certain Transactions with Other Companies. Any transaction with
> another company at which a related person's only relationship is as
> an employee (other than an executive officer), director or beneficial
> owner of less than 10% of that company's shares is pre-approved or
> ratified (as applicable) if the aggregate amount involved does not
> exceed the greater of $1.0 million or 5% of that company's total
> annual revenues.

2016 Proxy Statement at 49  (See Exhibit 1)

21.     Additionally  2016 Proxy Statement disclosed other related party transactions that are not

        pre-approved, but nevertheless specially approved by corporate management. 2016 Proxy

        Statement at 49-50  (See Exhibit 1)

22.     Rice Energy did not disclose all related party transactions; in particular, Rice Energy

        failed to disclose its related party transaction with Silver Creek Services.

23.     In May to July 2016,Mr. Wutherich became aware that Tunde Ajayi was partial owner of

        Silver Creek Services (SCS).

24.     Mr. Tundy Ajayi was an employee (other than an executive officer), director or beneficial

        owner of more than 10% of  Silver Creek Services shares.

25.     SCS was a provider of services to Rice Energy.  The aggregate amount of the services

5

provided exceeded the greater of $1.0 million or 5% of Silver Creek Services total annual revenues.

26. Any transaction with Silver Creek Services, was a large transaction that should have been specifically approved and reported to the shareholders of Rice Energy.

27. Mr. Wutherich  became aware of this large related transaction after Ajayi took Mr. Wutherich and others from his group to lunch and informed the group over lunch that he has partial owner of SCS.

28. Mr Tunde Ajayi stated that Rice Energy executives knew of his conflict and had asked him to divest his shares of SCS because of a potential conflict of interest.

29. Mr Tunde Ajayi did not divest his shares.

30. In September/October 2016, Rice Energy did an investigation.

31. Rice Energy asked Mr. Ajayi to specifically disclose what he was doing.

32. Mr. Wutherich's role in the investigation consisted of a making a presentation.  Mr. Wutherich reported his findings.

    a. The presentation was made to  COO Toby Rice concerning the use of SCS as the preferred service provider.  (Mr Wutherich, Toby Rice, and Mr. Ajayi were present.)

    b. Mr. Wutherich  provided information, caused information to be provided, and otherwise assisted in the investigation.

    c. During the presentation, Mr Wutherich confirmed that SCS was selected as the service provider; however, he made it clear that there were other providers that were more qualified based on the bids that were received.  In particular:

     i.     Around September 2016, the Completions department was asked to bid out services.

     ii.    The services included frac plugs/flow back services/sand trucking/well heads

     iii.   The Completions department was to contact suppliers who provide those services and request bids, however Ajayi had the final say.

     iv.   The recommended provider for frac plugs and well heads (portion) was Magnum (frac plugs) and GE (a portion of the well heads).

     v.    In the end, Mr.Ajayi over ruled the recommendation for providers and chose SCS as the provider for the services.

d.    During the meeting, Mr. Wutherich said that there were better providers than SCS because:

     i.     SCS was a new company. As a new company, SCS did not have any corporate experience in the handling of wellheads.

     ii.    SCS did not have a track record to determine where the main failure points of the wellhead are, and thus did not know how to address those failure points when they occurred. For example:

          (1)    When one of SCS's wellhead closed during pumping, SCS had no idea how that could have happened and responded by tying a heavy object to the control wheel to prevent it from happening rather than addressing the root cause.

          (2)    A small grease fitting fired out of a wellhead at extremely high

7

velocity which would have killed anyone who might have been in its path.

(3)    More examples were documented in the presentation.

e.    During the meeting, Mr Wutherich insinuated that Mr.Ajayi was self dealing, because he had an interest in SCS.

f.    During the meeting, Mr Wutherich insinuated that, due to the conflict of interest with Ajayi and SCS, bad business decisions were being made with regards to choosing SCS as the provider.

33.    Mr Wutherich believed that the selection of SCS was a securities violation, because:

a.    Rice Energy sells securities on the New York Stock Exchange.

b.    Rice Energy has an obligation to disclose conflicts of interest in its stock prospectus and other securities filings; and

c.    Rice Energy did not disclose the conflicts of interest.

34.    Mr Wutherich believed that the selection of SCS was a securities violation, because:

a.    Mr. Ajayi had a large stock ownership interest in SCS;

b.    The current contract with SCS was about $17,000,000 ;

c.    Past years contracts were about the same;

d.    Each contract was a large part of SCS total annual revenue; and,

e.    The stock price for Rice Energy stock could be effected by Ajayi's past and present self dealing.

f.    Also, this self dealing could have resulted in a safety issue. Wellhead failures are one of the primary causes of wellbore "blowouts". A blowout is extremely

dangerous and can cause death and massive environmental damage (as well as the
fines and remediation costs that go along with it)

35. Mr Wutherich's belief was reasonable because his belief was consistent with his
Sarbanes-Oxley training that said the bidding process must be fair.

36. Mr Wutherich's understanding was reasonable because a securities violation does occur
when a company  intentionally misrepresents or omits certain facts to investors, which
were material and which risked loss. (See, <u>Nielsen v. Aecom Tech. Corp.</u>, 762 F.3d 214,
223 (2nd Cir., 2014) quoting <u>Wiest v. Lynch</u>, 710 F.3d 121, 135-37 (3d Cir.2013)

37. Mr Wutherich was a whistle blower, for the following reasons:

   a.     He had a reasonable belief that there was a securities violation.

   b.     He reported the violation to Toby Rice.

   c.     Mr. Wutherich  provided information, caused information to be provided, and
          otherwise assisted in the investigation.

38. Mr Wutherich was terminated because of his whistle blowing, in particular.

   a.      Mr. Ajayi's conflict of interest involving SCS was fully known to Rice Energy
           executives. The Company, through several executives and managers, knew of the
           conflict for years but did not tell shareholders;

   b.     Rice Energy knew in 2014 that Tunde Ajayi owned 25% of SCS;

   c.     Rice Energy knew that it spent $15 to $16 million per year on SCS's services;

   d.     Rice Energy knew that any transaction with SCS should have been specifically
          approved and reported to the shareholders of Rice Energy;

   e.     Rice Energy knew of the conflict from 2014 to 2016; nevertheless, Mr. Ajayi

remained on the payroll; and,

    f.    Mr. Ajayi was terminated only after Mr. Wutherich insinuated that, due to the conflict of interest with Ajayi and SCS, bad business decisions were being made with regards to choosing of SCS as the provider instead of the better bids submitted by other providers.

    g.    Mr. Wutherich was terminated within 30 minutes of Mr. Ajayi being terminated, thus the timing further implies that Mr. Wutherich's termination was coincident with the whistleblowing.

39.    Rice Energy has never  reported Tunde Ajayi's conflict of interest to shareholders.

40.    Mr Wutherich was terminated, <u>at that time,</u> because of his whistle blowing.


EOG Resources


41.    As part of its fiduciary responsibilities to shareholders Rice Energy issues 10-K statements and other SEC materials relating to litigation risk.  The 2016, 10-k statement and the  2015, 10-k statement listed several litigation risks.

> We may incur substantial losses and be subject to substantial
>
> liability claims as a result of our operations. Additionally, we may
>
> not be insured for, or our insurance may be inadequate to protect us
>
> against, these risks. Our natural gas exploration and production
>
> activities are subject to all of the operating risks associated with
>
> drilling for and producing natural gas,  ...

10

See Exhibit 2,  Rice Energy form 10-k, For the Fiscal Year Ended December 31, 2015 and 2016.

42.    Rice Energy listed several litigation risks.  See Exhibit 2

43.    Rice Energy did not list theft of trade secrets as a litigation risk.

44.    Mr. Wutherich learned of a theft of trade secrets in the summer of 2016.

45.    Mr.Wutherich overheard engineer Jeff Lo and Derek Rice (Executive VP of Exploration)

        discuss data which Lo obtained from his previous employer (EOG Resources).

46.    Lo and Rice were having the discussion directly outside of Mr.Wutherich's office.  Mr.

        Wutherich's office door was always open. The data consisted of how Lo's previous

        employer designed their frac jobs (completions) as well as how the wells of the other

        company were producing.

47.    Mr. Wutherich questioned Lo about this immediately after the conversation. Lo had

        transferred large amounts of confidential data from his previous employer onto his

        personal hard drive and had provided that information to Rice Energy.

48.    Based on Mr. Wutherich's conversation with Lo, it was evident that at a minimum, the

        data contained:

        a.        Production data of all of EOG's assets;

        b.        The Well Design of all of EOG's Assets;

        c.        The Completion Design of all of EOG's Assets; and,

        d.        Any material information obtained on all of EOG's assets (log's, microseismic,

                  engineering reports etc).

49.    Mr. Wutherich informed Lo that he could be terminated for such illegal actions and may

        also receive a prison term if anyone found out.

11

50. Mr. Wutherich verbally reprimanded Lo.

51. Mr Wutherich reported the incident to Mr. Ajayi directly after he had reprimanded Lo.

52. Rice Energy already knew of the theft because Derek Rice, Executive VP of Exploration, was the recipient of the stolen data.

53. Rice Energy knew that the theft of EOG data was a litigation risk and that it was to be reported to the shareholders of Rice Energy because it reported other litigation risks to shareholders.

54. Rice Energy never  reported the theft of trade secrets to shareholders.

55. Instead of reporting the theft of trade secrets to shareholders, Rice Energy choose to use the stolen data.

56. Rice Energy used the EOG data to design a trial on one well to see whether EOG's strategy would work in Rice Energy's acreage.

57. Mr Wutherich was opposed to the use of the data.

    a. The test was scheduled in November 2016.

    b. Mr Wutherich told his staff that he opposed using the data.

    c. Mr Wutherich documented his opposition to the use of the data in the emails to Mr. Ajayi and others; and

    d. Mr Wutherich documented his opposition in Rice Energy's online data repository "salesforce" which is read by Toby Rice and others in management.

58. Rice Energy knew of Mr. Wutherich's opposition to the tests because

    a. His opposition was well known among the management and staff and

    b. Rice Energy inspected  Mr. Ajayi's computer (including his e-mail), as part of the

     SCS investigation, and Mr Wutherich documented his opposition to the use of the

     data in the emails to Mr. Ajayi

  c.  Toby Rice reads "salesforce".

59. The use of the data was a substantial litigation risk because  because of the amount of

  money involved:

  a.  Based on his knowledge as a chemical engineer, Mr. Wutherich reasonably

     believed, that the data acquired by Mr. Lo had substantial value.

  b.  Mr. Wutherich  reasonably believed that, even though Rice Energy is working on

     a different reservoir, it is proper to extrapolate the  EOG experience to Rice

     Energy and, in his opinion, EOG's trade secrets have the potential of doubling

     Rice Energy's production, which is worth $650MM in 2016.

  c.  EOG investor presentations confirm Mr. Wutherich's engineering opinion that the

     technology had substantial valuable.

     i.   The 2014 EOG investor presentation said that their "in house" design

       gave them a "competitive advantage."

     ii.  The 2017 EOG investor presentation confirms Mr. Wutherich's belief that

       the technology had substantial valuable.  EOG credits its technology as the

       reason that their wells produce approximately double what their peers

       wells produce, and they do that with significantly shorter laterals.

  d.   the data's retention and use created a substantial litigation risk because people go

     to jail for trade secret theft.

60. Mr Wutherich believed that the failure to disclose the illegal nature of its revenue to be a

securities violation.

a. Rice Energy sells securities on the New York Stock Exchange.

b. Rice Energy has an obligation to disclose the illegal nature of its revenue  in its stock prospectus and other securities filings.

c. Rice Energy did not disclose the conflicts of interest disclose  in its stock prospectus and other securities filings.

61. Mr. Wutherich's belief,  that the data's retention and use was a securities violation, was reasonable because it was based on his prior Sarbanes-Oxley training that said you can not use illegal means to generate revenue.

62. Mr Wutherich's belief,  that the data's retention and use was a securities violation,  was reasonable because a securities violation does occur when a company  intentionally misrepresents or omits certain facts to investors, which were material and which risked loss.' " (See, Nielsen v. Aecom Tech. Corp., 762 F.3d 214, 223 (2nd Cir., 2014) quoting Wiest v. Lynch, 710 F.3d 121, 135-37 (3d Cir.2013)

63.  Mr. Wutherich was a whistleblower because:

a. He had a reasonable belief that there was a securities violation.

b. He reported incident to  Mr. Ajayi

c. Mr Wutherich "caused information to be provided" to Rice Energy when he  told his management and staff that he opposed using the data.

d. Mr Wutherich "caused information to be provided" to Rice Energy when he documented his opposition to the use of the data in the emails to Mr. Ajayi

e. Mr. Wutherich  provided information, caused information to be provided, and

14

otherwise assisted in the SCS investigation which lead to the information Mr. Wutherich had on the EOG issue.

64.    Mr Wutherich was a whistle blower and was terminated because of his whistle blowing, because:

    a.    The test of the EOG data was scheduled in November 2016.

    b.    Ordinarily, Mr. Wutherich would get the test results.

    c.    Mr. Wutherich was terminated of employment just before the test results were available.

    d.    It is believed that he was terminated, at that time, to prevent his receipt of the test results, because he was a known whistle blower.

65.    Rice Energy never  reported the theft of EOG trade secrets to shareholders.

66.    Mr Wutherich was terminated, <u>at that time,</u> because of his whistleblowing.


<u>Age and nationality discrimination</u>


67.    In October of 2016, Mr Wutherich was 41 years old.  He was also a Canadian citizen.

68.    At all times material, he was discriminated against on account of his age and nationality.

69.    At the time he was hired he experienced discrimination.

    a.    In 2014, Mr Wutherich had interviewed with Mr. Toby Rice for the position of VP of Completions;

    b.    At that time, Mr. Rice had informed Mr. Wutherich that Rice Energy had an extremely young and dynamic workforce, and asked "how I would feel being one

of the oldest employees at Rice Energy";

c.    That position was eventually filled by Mr. Tunde Ajayi, who was several years younger than Mr. Wutherich;

d.    Mr. Wutherich was qualified for the position, and more qualified than Mr. Tunde Ajayi because in 2010-2011, Mr. Ajayi was mentored by Mr. Wutherich when they both worked at Schlumberger Oilfield Services;

e.    Mr. Wutherich was a more qualified and more experienced candidate than Mr. Ajayi;

f.    After Mr. Ajayi was hired as VP completions, he had approached Mr. Wutherich with a job offer as a completions adviser. That job title eventually changed to Director of Completions.

g.    Mr. Wutherich was the only management level employee who was a foreign national.

70.   During the course of his employment,  Mr. Wutherich experienced discrimination.

a.    Mr. Toby Rice had held several private functions at his personal residence where many of the younger VP's and Directors were invited.

b.    Mr. Wutherich (41) the Director of Completions and Mr. Guoynes (58) who was the Director of Drilling were not invited to any of these functions.

c.    With approximately 400 employees at Rice Energy, at the time of Mr. Wutherich's termination, only an estimated 5% to10% of employees were above the age of 40 and only two management level employees were foreign nationals.

d.    The Completions department at several times had been referred to by Rice

16

Energy's HR department as the most culturally diverse department, simply due to

the fact the our department contained one Canadian and one Columbian.

e.     Mr. Wutherich recommended the hiring of the Columbian.  This required Rice to

apply for a work visa for the Columbian.  After this process, Mr. Wutherich was

informed by Toby Rice and HR that Rice Energy will never again go through the

visa process Mr Wutherich took this as an instruction to not consider foreign

applicants for open positions, regardless of any unique strengths they may have.

71.     At the time of termination, others were treated more favorably.

a.     Michael Didier, was younger, and an American citizen.   He was also a partial

owner of SCS.  He had a conflict of interest; nevertheless he was simply asked to

resign from Rice Energy while maintaining a favorable consulting contract and

receiving his incentive bonuses.

b.     The American Presidential election was approaching and a culture of "America

First" was rampant throughout Rice Energy.  Mr. Wutherich was Canadian, with a

green card.  He was not  part of the  "America First" movement.

72.     After his termination, Mr. Wutherich's position was filled with an internal candidate who

was 29 years old and an American citizen.

73.     Mr Wutherich was terminated, <u>at that time,</u> because of discrimination on account of age

and nationality.

<u>There were no legitimate and non-discriminatory reasons for the termination of Kevin Wutherich</u>

17

74.     Mr. Wutherich was told that he was terminated because of his work with Drill2Frac.

75.     The reason is not legitimate because:

    a.     The alleged misconduct was  pre-approved and ratified as a "related party transaction" under the Rice Energy's policy for "Certain Transactions with Other Companies". (See Exhibit1);

    b.     Tunde Ajayi and Toby Rice had specifically approved the business activities with Drill2Frac.;

    c.     At the time he was hired, Rice Energy knew that Mr. Wutherich had other business interests, specifically the development of intellectual property related to all aspects of hydraulic fracturing;

        i.     The employment agreement was specifically amended to provide for Mr. Wutherich's continued research and development of Hydraulic Fracturing ("Fracing") technology;

        ii.     It was also agreed, and specifically included in the employment agreement, that Mr. Wutherich could pursue his own business opportunities provided that he had prior approval of the Company;

        iii.     The approval was given for his work at Drill2Frac and the approval was maintained because:

            (1)     Mr. Wutherich disclosed his business plan to Tunde Ajayi and Toby Rice and obtained approval;

            (2)      Mr. Wutherich was an employee (other than an executive officer), director or beneficial owner of less than 10% of Drill2Frac shares;

18

(3)     The aggregate amount involved <u>did not exceed</u> the greater of $1.0

        million or 5% of Drill2Frac total annual revenues;

(4)      Mr Wutherich's work with Drill2Frac was to improve their

        internal processes to such a degree where their services might

        eventually become useful to Rice Energy;

(5)     Drill2Frac did not compete with Rice Energy, Drill2Frac was a

        supplier of software services used in the Fracing industry;

(6)     Drill2Frac's software solution prior to Mr Wutherich's had several

        key flaws which limited it's application within Rice Energy;

(7)     Mr. Wutherich agreed to consult with Drill2Frac was to help them

        improve their technology to a point where it would become useful

        to Rice Energy;

(8)     After approximately 8 months of work with Drill2Frac, their

        processes improved to a point where Rice Energy was able to

        replace a $200,000 per well expense with a $15,000 expense;

(9)     This expense was further discounted to $3,500 per well due to Mr.

        Wutherich's relationship with Drill2Frac;

(10)    This is the equivalent of an almost $20,000,000/year savings to

        Rice Energy;

(11)    Mr. Wutherich disclosed his business plan to Tunde Ajayi and

        Toby Rice and obtained approval;

(12)     Mr. Wutherich disclosed his relationship to all the engineers that

19

reported to him, and recused himself from all business decisions related between Rice and Drill2Frac including the decision for Rice to Eventually use Drill2Frac as a replacement for the $200,000 service that Rice was currently using.

76.   Mr. Wutherich was told that he was terminated because he was developing hydro fracturing technology.  The reason is not legitimate because:

a.     Mr Wutherich did develop an invention for a hydraulic fracturing plug <u>prior to</u> working at Rice;

b.     Mr Wutherich did develop one specific breakthrough during his time working at Rice Energy.  Once this thought came to him, he developed it on his own time at home.

c.     Rice Energy knew and approved his research and development;

d.     Rice Energy modified his employment contract so that he could do research and development;

e.     The alleged misconduct was  pre-approved and ratified as a "related party transaction" under the Rice Energy's policy for <u>"Certain Transactions with Other Companies"</u>. (See Exhibit1);

f.     One key factor of the invention was improved on concurrently to Mr. Wutherich's employment with Rice (though not using Rice's equipment, time or resources), and a provisional patent was filed;

g.     Mr. Wutherich fully disclosed this to his supervisor, Tunde Ajayi, at the start;

h.     A plan was being formulated with Mr. Ajayi and Mr. Michael Didier on how Rice

Energy could best benefit from Mr. Wutherich's Invention; and,

i.      Mr. Wutherich's development of his invention was appropriate in every respect.

77.     Rice Energy had no evidence to support the discharge at the time of Mr. Wutherich's

termination.

78.     All the evidence that Rice Energy claims to have at this time could not have been the

reason for discharge, because Rice Energy had no evidence at the time of Mr.

Wutherich's discharge.

79.     The reason for termination was discriminatory because:

a.      Tunde Ajayi, Michael Didier, Derek Rice, and Jeff Lo were "similarly situated."

(In fact their conduct was far worse.)

b.      All three were American citizens and substantially younger than Mr. Wutherich.

c.      They were disciplined less severely.

d.      Both Tunde Ajayi and Michael Didier  were treated more favorably upon their

termination than Mr. Wutherich in terms of the vesting of stock options and the

award of continuing contracts.

<u>Count I (Sarbanes-Oxley Act of 2002)</u>

<u>18 U.S.C.1514A. Civil action to protect against retaliation in fraud cases</u>

80.     Paragraphs 1-79 and incorporated herein by reference.

81.     The Sarbanes-Oxley Act of 2002 makes it illegal to fire or otherwise discriminate against an

employee for providing information of a violation of a rule of the Securities and Exchange

Commission or any provision of federal law relating to fraud against shareholders, 18

U.S.C.§ 1514A(a)(1), including when the employee provides information or assistance to

someone with "supervisory authority over the employee" or with authority to "investigate, discover, or terminate misconduct".

82. On April 28, 2017, the Plaintiff mailed a complaint to the OSHA Office located in Pittsburgh, PA.  One hundred eighty days has passed.  He has completed all administrative pre-requisites.

83.  At all relevant time periods, Plaintiff was an employee of Defendant Rice Energy.

84. At all times material, Defendant Rice Energy had securities on the New York Stock Exchange.

85.  Mr Wutherich was a "whistle blower" as defined by  the Sarbanes-Oxley Act of 2002 because:

    a.    Mr Wutherich had a reasonable belief that there was a violation of the Securities Act

    b.    Mr Wutherich provided information or assistance to someone with "supervisory authority over the employee"; that is, Mr. Tunde Ajayi.

    c.    Mr. Wutherich  provided information, caused information to be provided, and otherwise assisted in the investigation by someone with authority to "investigate, discover, or terminate misconduct"; that is, the person who did the SCS investigation of Mr. Tunde Ajayi.

86. Whistleblowing was a substantial factor in the decision to terminate his employment because;

    a.    Mr Wutherich was  fired  for providing information of a violation of a rule of the Securities and Exchange Commission or  or any provision of federal law relating to fraud against shareholders,

22

b.      Mr Wutherich was otherwise discriminated against for providing information of a violation of a rule of the Securities and Exchange Commission or or any provision of federal law relating to fraud against shareholders,

87.     As a direct and legal result of the unlawful termination, Plaintiff has sustained and will sustain the following injuries and damages.

a.      The economic benefits of employment;

b.      Loss of reputation in the community;

c.      Emotional distress;

d.      All other damages that the court deems appropriate.

88.     As a legal and proximate result of Defendant's actions, Plaintiff has suffered special and general damages in an amount to be proven, but in excess of $75,000 plus benefits and stock options. In addition, Plaintiff is entitled to back pay otherwise owed with interest; and (iii) compensation for litigation costs, expert witness fees, and reasonable attorneys' fees.

WHEREFOR Plaintiff demands judgment against the Defendant and such other relief the court deems necessary and proper.

Count II  (Dodd-Frank Act)

15 U.S.C. § 78u-6(h). Prohibition Against Retaliation

89.     Paragraphs 1-88 are incorporated herein by reference.

90.     The Dodd-Frank Act protects all covered employees from retaliation for … (c) "making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002," the Securities Exchange Act of 1934, or "any other law, rule, or regulation subject to the jurisdiction

23

of the [SEC]." 15 U.S.C. § 78u-6(h).

91.     The Dodd-Frank anti-retaliation provision, 15 U.S.C. § 78u-6(h)(1)(A), provides

that "[n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in

any other manner discriminate against, a whistleblower in the terms and conditions of

employment because of any lawful act done by the whistleblower."

92.      Plaintiff was a "whistle blower" as defined by  the  Dodd-Frank Act because

      a.      He had a reasonable belief that there was a violation of the securities act;

      b.      He made a disclosure that was required or protected under the Sarbanes-Oxley Act
of 2002;

      c.      He make a disclosure that was required or protected under  "any other law, rule, or
regulation subject to the jurisdiction of the SEC.

93.     Whistleblowing was a substantial factor in the decision  to terminate his employment,

because;

      a.      He was retaliated against  for making disclosures that are required or protected under
the Sarbanes-Oxley Act of 2002;

      b.      He was retaliated against  for making disclosures that are required or protected under
"any other law, rule, or regulation subject to the jurisdiction of the SEC.

94.     As a direct and legal result of the unlawful termination, Plaintiff has sustained and will

sustain  the following injuries and damages.

      a.      The economic benefits of employment.

      b.      Loss of reputation in the community

      c.      Emotional distress

24

     d.     All other damages that the court deems appropriate.

95.    As a legal and proximate result of Defendants' actions, Plaintiff has suffered

special and general damages in an amount to be proven, but in excess of $75,000 plus benefits

and stock options. In addition, Plaintiff is entitled to two times the amount of back pay

otherwise owed with interest; and (iii) compensation for litigation costs, expert witness fees, and

reasonable attorneys' fees.

     WHEREFOR Plaintiff demands judgment against the Defendant and such other relief the

court deems necessary and proper.

Count III (Age Discrimination)

Age Discrimination in Employment Act, 29 U.S.C § 623

96.    Paragraphs 1-95 are incorporated herein by reference as though set forth at length herein.

97.     Defendant is an employer under the meaning of the Age Discrimination in Employment Act.

98.    Plaintiff was an employee with in meaning of the Age Discrimination in Employment Act

     at the time of his termination.

99.    At the time of termination, Plaintiff was over forty years of age.

100.    Plaintiff has met all the administrative prerequisites for filing suit.

101.    Defendant terminated Plaintiff and hired a substantially younger individual to perform the

     same duties that Plaintiff performed.

102.    He was discriminated against because he was regarded as being too old and replaced by a

significantly younger man.

    a.    The management at Rice Energy is in their 20's and 30's;

    b.    Mr. Wutherich was 41 years old; and for,

    c.    The additional reasons described above.

103.    Defendant knew or should have known that its actions would violate the Age Discrimination in Employment Act.

104.    As a direct and legal result of said age discrimination, Plaintiff has suffered the following injuries damages:

    a.    Plaintiff lost the economic benefits of employment;

    b.     Plaintiff lost professional status and reputation;

    c.    Plaintiff suffered substantial distress arising from the termination itself as well as the economic deprivation resulting from the termination.

    d.    Since his termination, Plaintiff has been unable to secure other equivalent or suitable replacement employment despite diligent employment search.

    e.    Plaintiff continues to suffer from lack of employment income until such time as he is able to locate other equivalent or suitable replacement employment.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendant for wrongful employment termination, requests compensatory and liquidated damages, and such other relief as the court deems appropriate.

Count IV (nationality discrimination)

Title VII, 42 U.S.C. § 2000e,

105.   Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 104 above.

106.   Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on or around November, 2017.  Plaintiff received a Notice of Right To Sue on January 30, 2018. All administrative prerequisites have been met.

107.   Plaintiff is Canadian, with a green card.

108.   This cause of action is brought pursuant to Title VII of the Civil Rights Act prohibiting termination of an employee from employment on the basis of nationality. Title VII of the Civil Rights Act prohibits, among other things, discrimination based on nationality is unlawful.

109.   Defendant Rice Energy violated Title VII of the Civil Rights Act because Plaintiff, is Canadian and suffered an adverse employment action as a result of his nationality.

110.   The American Presidential election was approaching and a culture of "America First" was rampant throughout Rice Energy.  Mr. Wutherich was Canadian, with a green card.  He was not  part of the  "America First" movement.

111.   At all times mentioned in this complaint Plaintiff was fully qualified for Plaintiff's position.

112.   Defendant discriminated against Plaintiff because of Plaintiff's nationality in that he was treated differently than American citizens.

113.   Plaintiff believes and alleges that Plaintiff's nationality was a substantial and determining

factor in Defendant employer's decision to terminate Plaintiff.

114.   Defendant's termination and other adverse employment actions towards Plaintiff as alleged in this complaint constitute an unlawful employment practice in violation of Title VII of the Civil Rights Act.

115.   Further, pursuant to 42 USC § 2000e–3(a), Defendant was precluded from retaliating against and/or terminating Plaintiff "because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." In response to Plaintiff's complaints, Defendant and its agents have retaliated against and refused to gainfully employ Plaintiff, to Plaintiff's detriment.

116.   As a direct, foreseeable, and proximate result of Defendants' discriminatory acts, Plaintiff has suffered and continues to suffer substantial losses in earnings and job benefits, and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount in excess of $75,000 plus benefits and stock options, the precise amount of which will be proven at trial.

117.   Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, fraudulent, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

118.   Plaintiff has incurred and continues to incur legal expenses and attorney fees. Plaintiff is

presently unaware of the precise amount of these expenses and fees and prays leave of court to amend this complaint when the amounts are more fully known.

WHEREFOR Plaintiff demands judgment against the Defendant and such other relief the court deems necessary and proper.

Respectfully Submitted

BEHREND & ERNSBERGER

/s/ Daniel W. Ernsberger

Daniel W. Ernsberger
PA ID: 30703
Behrend and Ernsberger, PC
12th Floor, Park Building
355 Fifth Avenue
Pittsburgh, PA 15222
(412) 391-2515 (telephone)
(412) 391-2762 (facsimile)