## UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN WUTHERICH, | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 2:18-cv-00200-CB-MPK |
| v. | ) | |
| | ) | Judge Cathy Bissoon as presider and |
| RICE ENERGY INC, a.k.a | ) | Magistrate Judge Maureen P. Kelly |
| EQT RE LLC, | ) | is Referred. |
| Defendant. | ) | |

Plaintiff's Brief in Opposition of Defendant's Motion for Summary Judgment

Introduction

This case is a wrongful discharge claim which arises under the Sarbanes-Oxley Act,

Title VII of the Civil Rights Act of 1964 and the  Age Discrimination in Employment Act, 29

U.S.C § 623 and the Pennsylvania Human Relations Act.

**I.**                            **Concise Summary of the Facts**

The Plaintiff, Kevin Wutherich, is over 40 years old and a Canadian citizen with an American

Green Card.  The Defendant, Rice Energy, was a publicly owned company with a class of securities

registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781).

`        The Plaintiff, Kevin Wutherich, was an employee of Rice Energy.  Mr. Wutherich was hired

by Rice Energy in May of 2015 as  Director of Completions. Mr. Wutherich was in charge of

everything from personnel, safety, process evaluations, software evaluation, and all other aspects of

running the department. Mr. Wutherich reported to Tunde Ajayi (Vice President of Completions),

who, in turn, reported to Toby Rice (Founder/COO/President). He asserts that he was discharged

from employment because of his age, nationality, and whistleblowing activities. There were two

whistleblowing events.  The first concerned Silver Creek Services ("SCS"). The second concerned

EOG Resources, ("EOG").

## **Silver Creek Services**

Rice Energy had a conflict of interest that was not reported to shareholders. SCS was a preferred service provider to Rice Energy and its Vice President of Completions, Mr. Tunde Ajayi, owned 25% of Silver Creek Services ("SCS"). SCS was paid more than the specified contract price for its services and SCS was paid more than other service providers for equivalent gas well completion services. Furthermore, Mr. Ajayi was approving requests for quotes, awarding work and approving invoices. Rice Energy never reported Tunde Ajayi's conflict of interest to shareholders. Rice Energy knew of the conflict from 2014 to 2016; nevertheless, Mr. Ajayi remained on the payroll[1].

In 2016, Rice Energy was planning a price lock-in for preferred service providers. The conflict of interest was an issue. The issue came down to value vs. price. Mr. Wutherich was the Director of Completions. He was called upon to gave a presentation to Toby Rice and others to ascertain whether the added value of using SCS was worth the added price. Mr. Wutherich's presentation demonstrated that SCS was <u>not</u> an appropriate service provider. Peter Foradori, the Vice President of Operations, agreed with Mr. Wutherich. Toby Rice, the President of the Corporation, disagreed. Peter Foradori felt he had no choice. He wrote a letter to the Board of Directors. He alleged fraud and coverup and resigned, Kevin Wutherich asked, "are we going to proceed with the price lock-in." He was terminated.[2]

---

[1] Admitted in answer to complaint at ¶38e

[2] Plaintiff's Statement of Facts Viewed in a Light Most Favorably to Defendant, ("PSFVLFD") Document 74-1, at ¶¶ 9-10

**EOG Resources**

Rice Energy had a second conflict of interest that was not reported to shareholders. A competitor, EOG Resources, ("EOG") had high density fracturing technology which EOG credits for its wells producing approximately double what their peers wells produce. Rice Energy acquired the data by hiring EOG's engineer-in-training Jeff Lo. By executive directive Jeff Lo was asked to conduct science experiments on high density fracturing. As a result, Rice Energy has given Mr. Lo credit  for managing the competitor intelligence surveillance program and for recommending well design changes with anticipated present value up-tick of $212,000,000.00[3]  The use of EOG data presented a litigation risk.  Rice Energy reported other litigation risks to shareholders but did not report the use of EOG data.[4]

Ryan Rice referred Mr. Lo to Mr. Wutherich, the Director of Completions because Jeff Lo was familiar with Spotfire (a hign end version of Excel) and Mr. Lo was hired.   Kevin Wutherich overheard the conversation between Derik Rice and Jeff Lo when Jeff Lo described the data he brought with him from EOG.   Kevin Wutherich talked to Jeff Lo.   He told Mr. Lo that the unauthorized use of trade secrets was illegal. Mr. Lo could go to jail. Also, he told the Vice President of complections, Tunde Ajayi.

At Mr. Lo's request, he was transferred out of the completions department.  Mr Wutherich was terminated. [5]

---

[3] PSFVLFD at ¶ 17

[4] PSFVLFD at ¶ 17

[5] PSFVLFD at ¶ 17

<u>Procedural Posture</u>

At the outset of this case, Defendant filed a motion to dismiss, pointed to the circumstantial evidence alleged in the complaint and argued that the facts alleged in the complaint did not state a cause of action.

The court recited the elements of proof required to state a claim for SOX retaliation and found that the circumstantial evidence alleged in the complaint does support a claim for SOX retaliation. The court denied Defendant"s Motion to Dismiss the SOX claim in all relevant respects.

<u>Discussion</u>

II.   LEGAL STANDARD

Plaintiff agrees with Defendant's statement of the legal standard that is used by the court to survive a summary judgment motion:

> "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has carried its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts" in question. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, "'summary judgment is essentially "put up or shut up" time for the non-moving party' who'must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.'" *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016) ("*Wiest II*") (quoting *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3dCir. 2006)). "[I]f the non-moving party has the burden of proof at trial, that party must set forth facts sufficient to establish the existence of an element essential to that party's case." *Id.* (quoting *Berckeley Inv. Grp.*, 455 F.3d at 201).

Defendant's Motion for Summary Judgment at page 3

Simply stated, the evaluation of a motion for summary judgment involves a shifting

burden of proof.

> The moving party bears the initial burden to identify "specific portions of the record that establish the absence of a genuine issue of material fact." *Santini,* 795 F.3d at 416 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ). If the moving party satisfies its burden, the burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.' "

Wiest v. Tyco Elec. Corp., 812 F.3d 319, 328 (3rd Cir., 2016)

Summary Judgment is awarded, or denied, depending on who carries their burden of proof. In this case, the shifting burden supports the Plaintiff. Rice Energy has failed to identify "specific portions of the record that establish the absence of a genuine issue of material fact" and Mr. Wutherich has "come forward with specific facts showing that there is a genuine issue for trial."

## III. A.  TO OBTAIN THE PROTECTION OF THE SARBANES–OXLEY ACT, AN EMPLOYEE MUST ESTABLISH A PRIMA FACIE CASE.

Plaintiff seeks relief pursuant to Section 806 of SOX, 18 U.S.C. § 15143A, which provides whistle blower protection for employees of publicly traded companies. The proof required in a SOX claim is concisely stated in this courts memorandum opinion in this case which ruled upon Defendants Motion to Dismiss:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781), ... may discharge, ... an employee ... because of any lawful act done by the employee ... to provide information, ..., or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C.] section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission,... when the information or assistance is provided to or the investigation is conducted by- ... a person with supervisory authority over the employee ... Wutherich v Rice Energy Case 2:18-cv-00200-CB-MPK Document 30 Filed 10/02/18 page 6, citing 18 U.S.C. § 15143A

5

The United States Court of Appeals for the Third Circuit has held that, to establish a prima facie case for such a claim- ··the employee must allege that he or she (1) engaged in a protected activity; (2) the respondent knew or suspected that the employee engaged in the protected activity;· (3) '[t]he employee suffered an adverse action;' and (4) "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action.'" Wtherich v Rice Energy Case 2:18-cv-00200-CB-MPK Document 30 Filed 10/02/18 page 7 citing Wiest v. Lvnch, 710 F.3d 121, 129 (3d Crf. 2013) .

The United States Court of Appeals for the Third Circuit has held that, to establish this type of protected activity." it is required -"that an employee's communication reflect a subjective and objectively reasonable belief that his employer's conduct constitutes a violation of an enumerated provision in Section 806." Wutherich v Rice Energy Case 2:18-cv-00200-CB-MPK Document 30 Filed 10/02/18 pages 7-8 citing Wiest v. Lvnch, 710 F.3d 121, 129 (3d Cir. 2013) .

### III A 1(a)    TO OBTAIN THE PROTECTION OF THE SARBANES–OXLEY ACT, AN EMPLOYEE MUST PROVIDE INFORMATION, WHICH THE EMPLOYEE REASONABLY BELIEVES CONSTITUTES A SECURITIES VIOLATION, TO A PERSON WITH SUPERVISORY AUTHORITY OVER THE EMPLOYEE .

Defendant has asserted that Plaintiff is not a whistle blower.  Defendant asserts that

Plaintiff has failed to blow the whistle in the SCS claim because he did not convey a reasonable

belief of wrongdoing:

> Plaintiff's communications about SCS amount to nothing more than an expression
> of disagreement with using SCS as a service provider – not conveying a
> reasonable belief of a violation of any of the enumerated provisions of § 806. ...
> (Defendant's Brief at page 9).

In making this argument, the Defendant is creating an issue that does not exist. Defendant

over looks the fact that the statute protects several different kinds of whistle blowing. Under one

section the whistleblower must "provide information".  In a separate section the whistleblower

must file suit and let the employer know that he is about to file suit.  The duty to convey

information is not the same under the two sections.

The whistle blower statute was written so that the case could be proven several different ways

1)      the whistle blower could be a bystander who "provides information" which the employee reasonably believes constitutes a securities violation, to a person with supervisory authority over the employee . This kind of whistle blower is found in section (1) of the statute.

2)      the whistle blower could be an individual who has filed suit or is about to file suit and tells the employer that what the employer is doing is wrong.  This kind of whistle blower is found in section (2) of the statute.

Section (1) and section (2) of the statute is recited below. The relevant part, (stated with bold lettering below,) states that a whistleblower need only "provide information" which the employee reasonably believes constitutes a securities violation, to a person with supervisory authority over the employee:

**No company ... may discharge**, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment **because of any lawful act done by the employee**—

(1) **to provide information**, cause information to be provided, or otherwise assist in an investigation regarding any conduct **which the employee reasonably believes constitutes a violation** of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, **when the information or assistance is provided to** or the investigation is conducted by—

 (A) a Federal regulatory or law enforcement agency;
 (B) any Member of Congress or any committee of Congress; or
 (C) **a person with supervisory authority over the employee** (or such other person working for the  employer who has the authority to investigate, discover,

or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344,or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

Plaintiff's case is under section "(1)" which requires the plaintiff to "provide information." Defendant is seeking to re-case the Plaintiff's case as a section (2) whistle blower which requires the plaintiff to prove that he was "to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer)"

Mr. Wutherich is a section (1) whistle blower.  On August 5, 2016, Rice Energy was negotiating a price lock-in with its suppliers[6].  As part of the process Mr. Wutherich "provided information" on the SCS when he provided the "value vs price"  information to Toby Rice and Tunde Ajayi.

He is a section (1) whistleblower because, on August 5, 2016, he "provided information"

_____

[6]This price lock-in was a securities issue because  Defendant was about to lock-in the price of a supplier who had a related party conflict.  Under SEC regulations, particularly section §229.404, the issue is whether "the rates or charges involved in the transaction were determined by competitive bids"
> The transaction is one where the rates or charges involved in the transaction are determined by competitive bids, or the transaction involves the rendering of services as a common or contract carrier, or public utility, at rates or charges fixed in conformity with law or governmental authority.

17 CFR § 229.404 (instruction number 7)
> Mr. Wutherich "provided information" with respect to "value vs price", that is, whether "the rates or charges involved in the transaction were determined by competitive bids" and concluded that the bid for SCS services was not "competitive".  The transaction should have been reported.

to Toby Rice and Tunde Ajayi that the use of SCS for frac plugs, flow back services, sand

trucking, and well heads, (JSUF at ¶ 33), because those items were overpriced. Toby Rice knew

that Kevin Wutherich was providing information about a conflict of interest. At the conclusion of

Mr. Wutherich's presentation,  Mr. Toby Rice said here wasn't an appearance of conflict. There

was a conflict:

> Q.     So did you come to the conclusion after, Mr
>        Wutherich's presentation that there was
>        an appearance of a conflict?
>
> A      There wasn't an appearance of conflict. There
>        was a conflict.

(Toby Rice depo at page 132) **(JA 87)**

Further, on October 3, 2016, Mr. Wutherich had objected to how the award of work had

been determined and was pushing for other vendors outside of Silvercreek services for some of

the work.  On October 3, 2016, he reminded Toby Rice that they had negotiated a 50% cut back

on frac stacks and flow back services (Exhibit 25, **JA 332**).  Toby Rice knew that Kevin

Wutherich was speaking out about wrongdoing because Toby Rice responded by saying that: "we

are not able to lock-in as long as there are conflicts.

Bruce will provide the ok." (Exhibit 25, **JA 332**)[7].

---

[7]Mr. Wutherich has also a section (2) whistleblower. On the SCS part of the case, Mr.
Wutherich did speak out and say that "What you are doing is wrong."  by identifying conduct that
falls within the ample bounds of the anti-fraud laws. According to the undisputed facts:

> 56.    Wutherich presented a PowerPoint presentation during this meeting, which
>        discussed various service providers for different services (plugs,
>        wellheads, frac stacks) and provided an overview of the RFQ process.
>        (J.A. Ex. H, Wutherich Tr. 224:9-12; J.A. Ex. N (filed under seal)).
>
> 57.    During the presentation, Wutherich "would have gone through those
>        points [in the PowerPoint Presentation]. I would have stated that I disagree
>        with those points, but in the end, the "incumbent" won. (J.A. Ex. H,

Further, Mr. Wutherich was a section (1) whistle blower when he "provided information" on the EOG claim[8]. Mr. Wutherich told Tunde Ajayi that Jeff Lo had taken trade secrets from EOG and given them to Rice Energy.   Tunde Ajay knew that Kevin Wutherich was speaking out about something that was wrong but Mr. Ajayi could not do anything about it because Jeff Lo gave the data to one of the Rice brothers, Derek Rice.

> Ajayi did not follow up or do anything with the information provided to him by Wutherich because he "did not think [he] needed to because of the fact that [Wutherich] had told Jeff about it, and that Jeff was given that data as well as to Derek Rice. So, [Ajayi] assumed that Derek would not that there was a contention." (J.A. Ex. A, Ajayi Tr. at 118:6-9-119:1-4). See.  JOINT STATEMENT OF UNDISPUTED FACTS at ¶ 35

Mr. Wutherich is a section (1) whistleblower because he "provided information" which he reasonably believed to be a securities violation.

Defendant goes on to say that Plaintiff was not a whistleblower because he was too indefinite, could not recall the specifics, and he did not tell Rice Energy anything that they did not already know.

> Plaintiff cannot show that his communication related to Lo and EOG amounts to protected activity since he does not even "recall the specifics" about what he told Ajayi. CSMF ¶ 15. Rather, he recalls only that he told Ajayi—the only Rice employee with whom he discussed this issue—"that it's illegal, that it's a crime being committed" and something about "the Rice brothers throwing [Lo] under the bus." JSUF ¶¶ 33-34.  (Defendant's Brief at page 6)

[T]here is no evidence that Plaintiff subjectively believed Rice was committing a

---

Wutherich Tr. 224:11-19).

[8]Mr. Wutherich has also proven a section (2) case.  Mr. Wutherich told Tunde Ajayi that what Jeff Lo had done is a crime. (JSUF at ¶ 33).

For section (1) Mr Wutherich provided the information that the EOG data was a trade secret.  For section (2) Mr Wutherich provided the additional information that the use of the EOG data was a crime.

securities violation at the time of his communications to Ajayi and Toby Rice. ...
Moreover, ... Plaintiff cannot even "recall the exact way [he] talked [about SCS]"
during the meeting with Ajayi and Toby Rice." (Defendant's Brief at page 10)

Because Plaintiff was not reporting any information that Rice did not already
know, he was not a whistleblower entitled to protection under SOX. (Defendant's
Brief at page 11)

Plaintiff cannot show that his communication related to Lo and EOG amounts to
protected activity since he does not even "recall the specifics" about whet he told
Ajayi... In a post-hac attempt to bring his communications with in the perview of
SOX, Plaintiff now claims that he "believed that the failure to disclose the illegal
nature of its revenue to be a securities violation" and that Rice's alleged use of the
data was a substantial litigation risk because of the amount of money involved. ...
(Defendant's Brief at page 12)

Indeed, Plaintiff's purported belief was based entirely on a rumor he had heard
about another employee at his former employer. As he testified, he "told [Lo] [he]
heard what he was talking about," and "remember[s] telling him that it was
illegal" and that "he can go to jail for this based on [a] . . . rumor [Wutherich]
heard at [his] previous employer, Schlumberger, where an employee left the
company, stole data, and [Wutherich] was told [the employee] is serving jail
time." JSUF ¶ 31. ...Distilled to its essence, Plaintiff's claim is that Rice had "to
disclose the illegal nature of its revenue in its stock prospectus." (Defendant's
Brief at page 7.)

Defendants supports its argument by citing law from other circuits in support of its

Motion for Summary Judgment. Defendant cites the Northern District of Illinois saying

disclosure of "alleged "[t]heft of trade secrets and inducement of others to share such secrets,

even if it may be unlawful, is not per se fraudulent or deceptive." *Fuqua v. SVOX AG*, 2014 WL

3811047, 2014 U.S. Dist. LEXIS 105090, *26 (N.D. Ill. Aug. 1, 2014). Defendant cites the

Second Circuit saying, "conduct that might "expos[e] the company to extreme financial risk and

thus constitute[] potential shareholder fraud…, is insufficient as a matter of law to make out a

claim under § 1514A." *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 223 (2d Cir. 2014)

None of these cases state the law in the Third Circuit. In Wiest, the Third Circuit

presented the law of the circuit.

> As so aptly stated by our dissenting colleague, the purpose of "[w]histleblower statutes like SOX § 806 [is] to protect people who ... stand against institutional pressures and say plainly, 'what you are doing here is wrong[9]' ... in the particular way identified in the statute at issue." By identifying conduct that falls within the ample bounds of the anti-fraud laws, an employee has done just that. <u>Wiest</u> at 132

In <u>Wiest</u>, the Third Circuit considered several incorrect findings of the District Court to

clarify the law and ensure that a whistleblower is protected even if he fails to allege or prove

materiality, scienter, reliance, economic loss, or loss causation:

> First, in dismissing Wiest's Complaint, the District Court concluded that an "employee's communication must convey that his concern with any alleged misconduct is linked to 'an objectively reasonable belief that the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss.' " [However, the correct statement is], "a complainant can engage in protected activity under Section 806 even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation." Id.

<u>Wiest</u> at 133 (citations omitted)

In <u>Wiest</u>, the Third Circuit considered whether the nature of the employee's

communication to his supervisor must implicate "a reasonable belief of an existing violation."

and concluded that it does not.

> Second, the District Court concluded that to constitute protected activity, the information contained within an employee's communication must implicate "a reasonable belief of an existing violation." ... [However] The ARB held that Section 806 protects an employee's communication about a violation that has not yet occurred "as long as the employee reasonably believes that the violation is likely to happen." We find this interpretation of the "reasonably believes" statutory phrase, 18 U.S.C. § 1514A(a)(1), to be reasonable given the statute's purpose to combat corporate wrongdoing. SeeS.Rep. No. 107–146, at 5 (2002)

---

[9]<u>Wiest</u> was a section (2) whistleblower case. The employee went beyond "providing information" and spoke out saying that employers conduct was wrong.

("Th[e] 'corporate code of silence' not only hampers investigations, but also
creates a climate where ongoing wrongdoing can occur with virtual impunity."). It
would frustrate that purpose to require an employee who knows that a violation is
imminent, to wait for the actual violation to occur when an earlier report possibly
could have prevented it.

Wiest at 133 (citations omitted)

In Wiest, the Third Circuit considered whether the nature of the employee's

communication to his supervisor and concluded that the plaintiff's intra-corporate

communications must relate in an understandable way to one of the stated provisions of federal

law.

Contrary to our dissenting colleague's assertion, we are not "ignor[ing] the need
for a whistleblower's employer to actually perceive that a whistle has been
blown." We agree with the Dissent that, in order for an employer to "know or
suspect that the whistleblower-plaintiff is engaged in protected conduct ... the
plaintiff's intra-corporate communications [must] relate in an understandable way
to one of the stated provisions of federal law [in § 806]." But the whistleblower's
communication need not ring the bell on each element of one of the stated
provisions of federal law to support an inference that the employer knew or
suspected that the plaintiff was blowing the whistle on conduct that may fall
within the ample reach of the anti-fraud laws listed in § 806. To hold that an
employer could not have suspected that the plaintiff was engaged in protected
activity because the communication did not recite facts showing an objectively
reasonable belief in the satisfaction of each element of one of the listed anti-fraud
provisions would eviscerate § 806

Id at 134 (citations omitted)

Defendants argument that Mr. Wutherich is unable to  "recall the specifics" is wrong.  In

the Third Circuit, the specific words are not important.  The whistle blower's communication

need not "ring the bell" on each element of one of the stated provisions of federal law.

Defendants argument about whether alleged misconduct does in fact "expose the company to

extreme financial risk" is wrong. The whistleblower could be mistaken.   Defendants argument

13

that the "complaints to management about executive decisions" might be misconstrued as mere disagreement is wrong. The only requirement is that plaintiff's intra-corporate communications must relate in an understandable way to one of the stated provisions of federal law.  And, Defendants argument that the employer already knew about the fraud is wrong.   Whistleblower statutes like SOX § 806 protect people who stand against institutional pressures and say plainly, 'what you are doing here is wrong'.  It does not matter whether the employer already knew it was wrong.

Defendant argument that Plaintiff was not a whistleblower because he was to indefinite, could not recall the specifics, and he did not tell Rice Energy anything that they did not already know has no basis in the law of the Third Circuit.  Defendants Motion for Summary Judgment must be denied.

### III A 1(b)   MR. WUTHERICH HAS HAS ESTABLISHED ENOUGH FACTS TO STATE A CLAIM FOR REPORTING A SECURITIES VIOLATION TO HIS SUPERVISOR, MR. AJAYI, AND OTHERS IN MANAGEMENT

Defendant's next issue is that Mr. Wutherich does not qualify as a whistle blower because Mr. Wutherich did not blow the whistle by speaking directly to the decision maker; that is, the person who terminated his employment.  Defendant says:

> Plaintiff failed to show that the decision maker knew or should have known of any alleged protected activity.

Defendant's brief at page 11[10]

---

[10]Defendant goes on to say:
As Plaintiff admits, he does not "recall the specifics" about what he told Ajayi about Lo and the alleged EOG data, aside from saying something about how "it's illegal, that it's a crime

Mr. Wutherich responds by saying that the Third Circuit has clearly defined what a whistleblower must do to become protected.  He must "provide information" to "a person with supervisory authority over the employee".  Plaintiff responds that the Defendant has overlooked the words of the Sarbanes–Oxley Act and has created and issue that does not exist.

The reporting requirement is to "a person with supervisory authority over the employee" <u>or in the alternative</u> to "such other person working for the employer who has the authority to investigate, discover, or terminate misconduct" The statute does not require the employee to complain directly to the decision maker who terminates his employment.  Sarbanes–Oxley says:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 ... may discharge.... when the information ... is provided to *... a person with supervisory authority over the employee (**or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct**)*

18 U.S.C. §1514A. (Emphasis added)

---

being committed . . . ." JSUF ¶ 33. ... It is also apparent that Ajayi himself did not understand Plaintiff's communication to relate to SOX because Ajayi did not follow up or do anything with the information that Plaintiff provided. JSUF ¶¶ 35-36. Defendant's brief at page 12

While Plaintiff claims that he also "opposed" certain "science experiments" that Rice conducted involving high-density clusters, he never publicly stated that his "opposition" related to the alleged EOG data; instead, he opposed the tests "publicly due to technical reasons." CSMF ¶ 8. ... Likewise with respect to SCS, Plaintiff claims to have made two complaints about the RFQ process as it related to the selection of SCS as a service provider. CSMF ¶ 21. The first was to Ajayi and the second was during a presentation to Ajayi and Toby Rice. Id. ¶ 22. But Plaintiff "does not recall exactly what [he] told [Ajayi], other than a disagreement with the decision" to select SCS as a service provider. Id. ¶ 23. During his deposition, Wutherich agreed that it was fair to characterize his complaint to Ajayi to be that he did not think SCS should be the vendor that should be used. Id. ¶ 24. Defendant's brief at page 13

The decision maker, Daniel Rice, was not aware of any of these alleged communications. Defendant's brief at page 14

The statute says  "or such other".  This means that the statute was written such that "*a person with supervisory authority over the employee*" is presumed to be a "*person working for the employer who has the authority to investigate, discover, or terminate misconduct*". That is the meaning of the word "other".  Once the employee alleges that he reported the matter to his supervisor the statute requires no separate proof that the supervisor has "*has the authority to investigate, discover, or terminate misconduct*."

Defendant's brief is based on the alternative reporting requirement to a person who"*has the authority to investigate, discover, or terminate misconduct*." and not the initial reporting requirement to "*a person with supervisory authority over the employee*".  By so doing Defendant has created an issue that does not exist.

Mr. Wutherich "provided information" to "a person with supervisory authority over the employee", Mr. Tunde Ajayi, concerning the illegal use of EOG data.  Specifically:

> Wutherich told Ajayi something "very close to what [he] told Jeff [Lo] himself" – "that it's illegal, that it's a crime being committed. I remember telling Tunde that – talking about the Rice brother throwing him under the bus. Those were things that I do recall." (J.A. Ex. H, Wutherich Tr. at 199:25-200:1-7). **JSUF ¶ 31-33**

Further, Mr. Wutherich "provided information" to "a person with supervisory authority over the employee", Mr. Tunde Ajayi,, and to the corporate President Toby Rice concerning the SCS.  He said :

> I would have gone through those points [in the power point presentation]. I would have stated that I disagree with those points, but in the end the "incumbent" won. **JSUF ¶ 55-56**

The statute does not require a whistle blower to "provide information" directly to the person who made the decision to terminate his employment.  Mr. Wutherich is a statutory whistle

blower.  Defendants Motion for Summary Judgment must be denied.

### III A 1 (c)   MR. WUTHERICH HAS ESTABLISHED A LEGITIMATE ISSUE OF FACT TO DEMONSTRATE THAT HIS PROTECTED ACTIVITY WAS A FACTOR IN THE TERMINATION DECISION.

Defendant argues that there is no evidence that Plaintiff's alleged protected activity was a

"contributing factor" in Rice's decision to terminate his employment. Defendant says:

> First, there is no temporal proximity between the alleged whistleblowing and Plaintiff's termination. Plaintiff's alleged report to Ajayi about Lo and EOG occurred in July 2016. CSMF ¶¶ 12, 14. His alleged report to Toby Rice and Ajayi about SCS occurred in early August 2016. JSUF ¶¶ 55-57. But Rice did not terminate his employment until more than two months after his communications about SCS and more than three months after his communication about Lo and EOG. *Id.* ¶ 68.

> Second, there was a "legitimate intervening event" that led to Plaintiff's termination. In October of 2016, Toby Rice instructed all Rice employees to disclose any previously undisclosed conflicts of interest to Rice's Director of Internal Audit, Bruce Jenkins. CSMF ¶ 39.

Defendant's brief at 16

In support of its motion, Defendant directs the courts attention to Wiest v. Tyco Elecs.

Corp., 812 F.3d 319 (3rd Cir., 2016) (Weist II). (Defendant's brief at page 15)  In *Wiest II*, there

was a 10 month gap between the protected activity and the termination. The court said:

> As noted, Wiest last engaged in protected activity on October 10, 2008, and the adverse employment action with respect to the preliminary determination to terminate him occurred in September 2009. Thus, temporal proximity does not support Wiest's theory of causation.

Weist II at 332.

Additionally, in Weist II, the court identified a "legitimate intervening events such that

17

any causal connection that could be derived from the circumstances was severed." Five

intervening events were identified:

> Specifically, the record demonstrates that: (1) Wiest received praise and
> commendations both during and after his protected activity; (2) none of the
> individuals who initiated the investigation with human resources had any
> knowledge of Wiest's protected activity; (3) Susan Wallace, who conducted the
> investigation, had no knowledge of Wiest's protected activity; (4) Wiest's
> colleagues in the accounting department who were as involved, or more involved,
> in the same activity did not receive any negative treatment; and (5) Tyco's
> Wireless Business Unit, the Tyco unit involved in the events, was sold to another
> company in May 2009 and the employees who Wiest contends he frustrated
> remained with the unit after the sale and no longer had any involvement with Tyco
> when the investigation was initiated.

Weist II at 332.

The legal issue identified by the Third Circuit is whether "the circumstances were

sufficient to raise the inference that the protected activity was a contributing factor in the adverse

action."  More specifically, the issue is whether the protected activity was a "contributing factor".

In Weist II, the court found that a "contributing factor" is "any factor, which alone or in

combination with other factors, tends to affect in any way the outcome of the decision.'" *Wiest II*,

812 F.3d at 330.

The facts of Weiss II are different from the facts in the present case.  In Weiss II,

everyone agreed that was a significant passage of time between the protected activity and the

termination.  In Weiss II, everyone agreed that independent intervening events took place.  Based

on those undisputed facts, the court concluded that the protected activity was not a "contributing

factor" which "tends to affect in any way the outcome of the decision". The conclusion was

based on the undisputed passage of time and the undisputed intervening events.

The facts of the present case against Rice Energy give rise to a conclusion that the

18

protected activity <u>was</u> a "contributing factor" which "tends to affect in any way the outcome of the decision" for the very reasons stated in <u>Weist II</u>.

The facts of the present case support Mr. Wutherich.   First there was a very short passage of time between the protected activity and the termination.  Plaintiff's report to Ajayi about Lo and EOG occurred in July 2016. CSMF ¶¶ 12, 14. His report to Toby Rice and Ajayi about SCS occurred in early August 2016. JSUF ¶¶ 55-57.  By defendants reckoning it was about two to three months.  (Defendant's brief at 16)  But, the passage of time is disputed because the termination decision was made <u>before</u> the actual termination date and there was more than one protected activity.  In effect there was no passage of time between the protected activity and the termination.  It was one continuous act.

The following time line[11], with the significant dates[12] in italics, shows that the protected activity and the termination was one continuous process:

On *May 11, 2016*, there were actually two conflicts. One with Mike Didier and the second Tunde Ajayi by virtue of their ownership of SCS stock (Toby Rice depo at page 40) **(JA 68)** (Exhibit 9) **(JA283)**

On *May 11, 2016* it was found that Didier and Tunde were approving SCS invoices.(Toby Rice depo at page 49, 50) **(JA 69)** (Exhibit 10) **(JA284)**

On *May 11, 2016,* Toby did a quick sample of 30 SCS invoices to determine whether Tunde was approving SCS invoices and concluded that Tunde was not. (Toby Rice depo at pagg 51) (JA 70)  (Exhibit 11) **(JA285)**

---

[11]The time line is derived from PSFVLFD at ¶ 10.

[12]The dates are derived room the exhibits in the case.

On *May 11, 2016,* Peter Foradori disagreed. His finding was that "Tunde/Didier are still approving RFQs, awarding work and approving invoices." (Toby Rice depo at page 51-54) (JA 70) (Exhibit 11) **(JA285)**

*On July 28th and 29th of 2016* Rice Energy was in the middle of the price lock-in initative.  (Toby Rice depo at page 76) **(JA 75)**

On *July 29, 2016,* Nehemiah Katz reported that the selection of SCS over the low bids was reducing the net profit of Rice Energy by more than 2%.

> By choosing SCSover the low bids (in this case GE, Diamondback, and McClinton)we are walking over $9.7 million (1.2% annual gross) with an Impact of 2%+ on net profit per our discussion yesterday based on the data from Finance. (Exhibit 14)**( JA 292)** (see also,Toby Rice depo at page 78) **(JA 75)**

On *July 29, 2016,* when confronted by Katz, Toby Rice said we have not selected anyone yet.  Lets have a session with Tunde before we discuss any more scenarios. Toby Rice said:

> Q.    Nehemiah Katz is saying that we're walking over 9.7 milllon and then your response is,"Got It, appreciate it, obvious statement, we haven't selected SCS for anything yet so let's get through a session with Tunde before spending any more time creating these scenarios." What did you mean when you said that?
>
> A     We are going to research - we will show you - let's talk through why these guys think that their decisions so that they can justify their decision.

(Exhibit 14)**( JA 292)** (see also,Toby Rice depo at page 79-80) **(JA 76)**

The issue was value vs price.  The issue was whether the added value of using SCS was worth the added price.   Mr. Wutherich was to make that evaluation.

> Q     So when you're talking about this Value vs.
>       Price effort, Mr. Wuthorich would be in the room
>       telling you whether there was value vs price?
>
> A     Yeah.

(Toby Rice depo at page 81) **(JA 76)**

On *August 5, 2016* Mr. Wutherich made his presentation of value versus price. (Toby

Rice depo at page 91-97) **(JA 77-78)** At the conclusion of Mr. Wutherich's presentation,  Mr.

Toby Rice said here wasn't an appearance of conflict. There was a conflict:

> Q.      So did you come to the conclusion after, Mr
>         Wutherich's presentation that there was
>         an appearance of a conflict?
>
> A       There wasn't an appearance of conflict. There
>         was a conflict.

(Toby Rice depo at page 132) **(JA 87)**

*On August 10, 2016,* this conflict of interest with SCS was a major concern and it was

elevated for review to Daniel Rice (Toby Rice depo. at page 100) **(JA 79)**  (Exhibit 20)**( JA 323 )**

*On August 10, 2016,* two groups wanted to talk to Daniel Rice about SCS. One group was

concerned about Tunde Ajayi's stock ownership in SCS. The second group was to be sure that

everything was straight with the auditors. (Exhibit 20)**( JA 323 )**(Toby Rice depo at page

101-105) **(JA 79-80)**

On *September 2, 2016* Peter Foradori was concerned that things were not going the right

way. Peter Foradori was upset about SCS.(Toby Rice depo at page 107-108) **(JA 81)**  (Exhibit

21)**(JA 325)**

On *September 2, 2016*, Peter Foradori and Toby Rice could not agree on how to proceed.

There was a breakdown in their relationship. Peter Foradori was saying "I look forward to

returning to a relationship that was excellent as recently as a month and a half ago. (Toby Rice

depo at page 105) **(JA 80)** (Exhibit 21)**(JA 327)**

On *September 2, 2016* ,the brake down in the relationship was a month and a half earlier. That takes us back to the time that Mr. Wutherich made his presentation. (Toby Rice depo at page 108) **(JA 81)**

On *September 2, 2016*, Toby Rice felt he had to terminate Peter Foradori. (Toby Rice depo at page 110) **(JA 81)** (Exhibit 21)**(JA 325)** The email string said that we need to tell Peter Foradori that Silver Creek was all wrapped up so when we let him go later this coming week, he is less likely to make a stink:

> Like I said, wish I had a magic bullet but I think we move on. I would also be fine telling him Tuesday that Silver Creek was all wrapped up so when we let him go later this coming week, he is less likely to make a stink. And, we could always extend him some small severance in exchange for signing a very specific SRA.

(Exhibit 21)**(JA 325)** (Toby Rice depo at page 109) **(JA 81)**

On *September 12, 2016*, Peter Foradori would not be terminated.  He resigned. In a letter to the Board of Directors he said:

> On the subject of my resignation, I feel that I owe you the same explanation I just gave our President and COO. My reasons are twofold.
>
> First, my sense of personal honor demands I leave over the continuing conflict of interest with Silver Creek Services. The simple fact is that my department runs RFQs involving Silver Creek Services in good faith at your request. The Completions Department then abuses the Procurement Guidelines to funnel contracts toward Silver Creek without clear justification and at above market rates. I understand and accept that the executive team is satisfied that adherence to the letter of the guideline is sufficient. My interpretation, however, is that *I am being forced to whitewash ongoing fraud.* This is unacceptable to me and I see no remedy at this point other than my resignation.
>
> Second, mandates prohibiting me from sharing information of material effect to the company with the executive team or other impacted members of Rice senior management, place me in an untenable position. *I*

*either have to disobey a directive from my reporting senior or fail in*
*my fiduciary responsibilities to our shareholders. I chose and continue*
*choosing our shareholders* (as a whole). My reporting senior made it clear
that choice cost me his trust. As trust is imperative to any relationship and
my conscience will not allow me to do the things required for winning
back his trust in this regard, again, my only remedy at this juncture is
resignation.    (Exhibit 24)**(JA 331)** and Toby Rice deposition at page 114-115)
(emphasis added) **(JA 331)**

On *September 12, 2016*, Mr. Foradori resigned (Exhibit 24) **(JA 331)**

*On October 3, 2016,* Mr. Wutherich asked whether we are to proceed with SCS a price

adjustment and lock-in. (Exhibit 25), (Toby Rice depo at page 118-119) **(JA 83-84).**

*On October 3, 2016,* Mr. Wutherich negotiated a cut back of SCS participation by 50%.

He reminded Toby Rice that:

As we presented to you previously, we have negotiated with SCS a price
adjustment and lock-in (attached) for the following

50% of frac stacks
Frac plugs
Sand Hauling
50% of flowback.

(Exhibit 25)**( JA 332)**

*On October 3, 2016,* Toby Rice responded that we must wait until after the conflict was

eliminated. Bruce Jenkins will give the OK. (Toby Rice depo at page 119) **(JA 84).**  (Exhibit 25)

**(JA 332)**

*On October 17, 2016,* Toby Rice asked Kevin Wutherich to disclose his work with

Drill2Frac to Bruce Jenkins. (Toby Rice depo. page 156, line 5) **(JA 91).** This was Kevin

Wutherich's <u>second</u> disclosure.  Kevin Wutherich made this second disclosure to Bruce Jenkins.

(Exhibit 50.1) **(JA 387)** The first disclosure was made a year earlier. The first disclosure was

given to the V.P. of Human Resources, Coach Reichman   (Exhibit 49) **(JA 385).** In the earlier

disclosure to Coach Reichman, Mr. Wutherich specifically asked whether there would be a

conflict of interest:

> Please let me know your thoughts, and if there is a potential conflict of interest
> that would prohibit this type of relationship.

 (Exhibit 49) **(JA 385).**

*On October 17, 2016*, upon receipt of the second disclosure, Bruce Jenkins initiated a

conflict of interest investigation of Mr. Wutherich. No one told him that Kevin Wutherich had

earlier disclosed his work with Drill2Frac to Coach Reichman so Bruce Jenkins started his own

investigation.   (Bruce Jenkins depo at pages 53) **(JA 24).**

*Sometime after October 17, 2016,,* Bruce Jenkins asked Toby Rice whether Mr.

Wutherich had made a previous disclosure and Toby Rice confirmed that he had previously

approved Mr. Wutherich being on the Board of Directors of Drill2Frac. (Bruce Jenkins depo. at

pages 55-58) **(JA 25).**

*Sometime after October 17, 2016*, Toby Rice said that he did not know that Mr.

Wutherich was to be paid for his work. "That puts us in another category of concern."(Toby Rice

depo at page 125) **(JA 85).**

*N*o one talked to Coach Reichman to see whether the compensation package was

approved in 2015.

> Q      Okay. Do you know whether Coach Rikeman
>         followed up and got a copy of [this compensation package ]?
> A      I don't know.
> Q      If Coach Rikeman was doing his job, would he
>         follow up and get a copy of this document?

A     I don't know[13].

(Toby Rice depo at page 157) **(JA 91).**

*Sometime after October 17, 2016*, Bruce Jenkins told Daniel Rice that Mr. Wutherich was abusing his position as an advisor to Drill2Frac and the decision to terminate was clear and very simple. (Daniel Rice depo at page 61) **(JA 54).**

On *October 31, 2016*, Mr. Wutherich was terminated.  Tunde Ajayi and Mike Didier were terminated the same day.  (Mike Didier's resignation being announced two weeks earlier.)

This time line demonstrates two things.  First, there was a very short passage of time between the protected activity and the termination.  Second, there was no independent intervening event that separated the protected activity and the termination.

It is plaintiff's burden to show that "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action." Wutherich v Rice Energy Case 2:18-cv-00200-CB-MPK Document 30 Filed 10/02/18 page 7 citing Wiest v. Lynch, 710 F.3d 121, 129 (3d Crf. 2013) . This time line demonstrates that "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action."  Plaintiff has met his burden to present evidence.

---

[13]The Plaintiff contends that Toby Rice's reason for termination is not legitimate because, according to the employee handbook, all the employee must do is report the potential conflict to his supervisor in writing. Mr. Wutherich disclosed his work at Dril2Frak orally to Toby Rice and Tunde Ajayi and in writing to Coach Reichman.  It is the responsibility of the supervisor to follow up. (Rice 4)**(JA 185)**.

Also, Toby Rice's reason for termination is not legitimate because the investigation was based on corrupt data, fake email and varying excuses. Finally the termination was motivated by the forfeiture and redistribution of $2,000,000 in stock bonuses.  (See Plaintiff's Brief in support of Plaintiff's Motion for Summary Judgment ,Document 74, Filed 10/15/19, at page11 and Plaintiff's Statement of Facts Viewed in a Light Most Favorably to Defendant, Document 74-1, at ¶¶ 41-43, 54-59.)

There is more. The facts of the present case against Rice Energy give rise to a conclusion that the protected activity <u>was</u> a "contributing factor" which "tends to affect in any way the outcome of the decision" because there was a second protected activity.   Rice Energy had a second conflict of interest that was not reported to shareholders.

Ryan Rice referred Mr. Lo to Mr. Wutherich, the Director of Completions because Jeff Lo was familiar with Spotfire (a hign end version of Excel) and Mr. Lo was hired. (Wutherich Depo pages 169-170) (see also Exhibit 43) **(JA372)** <u>Ryan Rice did not say that Jeff Lo was familiar with EOG data.</u>   At the outset, the true purpose for hiring Jeff Lo was concealed from Mr. Wutherich. A conversation about EOG data was overheard. Jeff Lo was bragging how he used Spotfire at EOG to hack through EOG firewalls.  (Wutherich Depo at 192) **(JA 122)** and Mr. Wutherich objected to the use of the EOG data. In the end, Rice Energy gave Mr. Lo credit for managing the competitor intelligence surveillance program and for recommending well design changes with anticipated present value up-tick of $212,000,000.00. The services that Mr. Wutherich and Tunde Ajayi provided as chemical engineers were no longer needed because Rice Energy now had the EOG data to direct well completions.  Both he and Tunde Ajayi were dismissed and their stock options, worth $2,000,000, were re-distributed[14].

This narrative demonstrates that "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action."  Plaintiff has met his burden to present evidence. Defendant's Motion for Summary Judgment must be dismissed.

---

[14]See also: Plaintiff's Brief in Support of Plainitff's Partial Motion for Summary Judgment for the details.

### III A 2.   RICE ENERGY HAS NOT CARRIED ITS BURDEN OF PROVING ITS AFFIRMATIVE DEFENSE WITH CLEAR AND CONVINCING EVIDENCE.

Defendant Rice Energy seeks summary judgment upon its affirmative defense[15].

Defendant must show by clear and convincing evidence that it would have taken the same

adverse action in the absence of the protected activity.

> If [Plaintiff] satisfies his burden to identify evidence to support all four elements,
> the burden will shift to [Defendant] to demonstrate "by clear and convincing
> evidence that [it] would have taken the same [adverse] action in the absence of
> [any protected activity]."

Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 329  (3rd Cir., 2016)

In support of its motion, Defendant seeks to prove with clear and convincing evidence[16]

that Bruce Jenkins had no knowledge of Plaintiff's protected activity.

---

[15]In a summary judgment motion the burden to present evedance depends on who caiires the burden of proof.

　　　If the non-moving party has the burden of proof at trial, that party must set forth facts sufficient to establish the existence of an element essential to that party's case. Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 330 (3rd Cir., 2016)

　　　In this section of defendant's motion, the defendant is the moving party and the defendant carries the burden of proof.  The plaintiff is the non-moving party and has no duty to set forth facts essential to the claim.

[16]The "clear and convincing evidence" standard is the intermediate burden of proof, in between "a preponderance of the evidence" and "proof beyond a reasonable doubt." To meet the burden, the employer must show that "the truth of its factual contentions are highly probable." Araujo v. N.J. Transit Rail Operations, Inc., 708 F.3d 152, 159 (3rd Cir., 2013)

Months after any alleged protected activity, Plaintiff disclosed to Jenkins the extent of his relationship with Drill2Frac and that he was being paid for referrals. CSMF ¶ 40. Jenkins—who had **no knowledge** of Plaintiff's alleged protected activity (CSMF ¶¶ 44-45)—investigated. ...

The facts to not support that conclusion that Defendant seeks. Mr. Jenkins was the internal auditor. He had knowledge of Plaintiff's protected activity. On *February 15, 2016*, Bruce Jenkins was the person to receive the initial report from the external auditor, Kara Kott, that SCS/Didier was over billing. (Exhibit 6) **(JA 278)**. On *February 16, 2016* Bruce Jenkins received an email from Daniel Rice asking for an investigation. Daniel Rice asked Mr. Jenkins whether Toby Rice was already in the loop. (Exhibit 6) **(JA 279)**. On *February 29, 2016*, Mr. Jenkins reported back that we are "Treating SCS the same as any other provider as part of the procurement audit." (Exhibit 7) **(JA 280)**. Again on *February 29 2016*, Mr. Jenkins reported to Daniel Rice and others that "Am I reading this right that at this time we can't reconcile $6.1mm we paid them?" (Exhibit 8) **(JA 282)**. On *May 11, 2016* Mr. Jenkins told Daniel Rice and Toby Rice that Neomiah Katz was passing out no-bid contracts to SCS. Mr. Jenkins said that "I think we have an open book with SCS too now, but not sure Neomiah Katz is bidding out all of the services that is being awarded to them." (Exhibit 9) **(JA 283)**. On *August 10 2016*, five days after Mr. Wutherich made his "value vs price" presentation Mr. Jenkins joined in the meeting with Daniel Rice to consider the SCS conflict of interest. (Exhibit 20) **(JA 232)**. On *September 12, 2016*, Toby Rice asked Mr. Jenkins where in "salesforce" was a copy of Mr. Wutherich's August 5, 2016 "value vs price" presentation. (Toby Rice depo p 113) **(JA 82)** (Exhibit 23) **(JA 328)**. On *September 12, 2016*, when Peter Foradori submitted his letter of resignation claiming fraud and coverup in SCS, Bruce Jenkins was appointed to represent the Board of Directors. (Tunde

Ajayi depo at page 104) **(JA 8).**  *On October 3, 2016,* Toby Rice made the price lock-in

contingent on Bruce Jenkins approval. (Toby Rice depo at page 119) **(JA 84).**  (Exhibit 25) **(JA**

**332)** On *October 12, 2016* Toby Rice told Bruce Jenkins "I am going to speak with Mike Didier

next week to finalize his separation with Rice.  (Exhibit 26) **(JA 233)**.

Defendant's claim for Summary Judgment based on the "fact" Bruce Jenkins had no

knowledge of Plaintiff's protected activity has absolutely no support in the record.  It should be

enough to say that: On *September 12, 2016*, Toby Rice asked  Mr. Jenkins where in "salesforce"

was a copy of Mr. Wutherich's August 5, 2016 "value vs price" presentation. (Exhibit 22) **(JA**

**328)**.   But, there is more.   *February 15, 2016*, Bruce Jenkins had knowledge of SCS conflict

from the beginning. He was the person to receive the initial report from the external auditor, Kara

Kott, that SCS/Didier was over billing. (Exhibit 6) **(JA 278)**. And, and he was responsible for its

final resolution.

As a second reason for Summary judgment Defendant says that Mr. Jenkins uncovered

violations of Rice policy.

> And the investigation uncovered violations of Rice policy that, in the view of the
> decision maker, Daniel Rice, warranted Plaintiff's termination. CSMF ¶¶ 50-52.

Defendant's brief at 18-19

There is no factual basis for the claim that Bruce Jenkins uncovered anything.  On

*October 3, 2016*, Mr. Wutherich negotiated a 50% cut in SCS services.  Toby Rice replied: "we

are not able to lock-in as long as there are conflicts. Bruce [Jenkins] will provide the ok."

(Exhibit 25)**( JA 332)**. The investigation started with Toby Rice and not Bruce Jenkins. *On

October 17, 2016,* Toby Rice asked Kevin Wutherich to disclose his work with Drill2Frac to

Bruce Jenkins. (Toby Rice depo. page 156) **(JA-91).** But Bruce Jenkins made a perfunctory investigation.  Bruce Jenkins discovered that Toby Rice had approved some work with Drill2Frac, but Bruce Jenkins never talked to Coach Reichman to find out what work was approved. (Bruce Jenkins depo. page 53) **(JA-24).** Kevin Wutherich had made a disclosure to Coach Reichman in 2015.  Kevin Wutherich asked Coach Reichman "Please let me know your thoughts, and if there is a potential conflict of interest that would prohibit this type of relationship.**"**  (Exhibit 49) **(JA 385).**  Bruce Jenkins never talked to Coach Reichman. (Bruce Jenkins depo. page 53) **(JA-24).**   Bruce Jenkins never talked to KevinWutherich or Tunde Ajayi. The Bruce Jenkins investigation did not include the key witnesses.

There is no factual basis for Defendant's Motion for Summary Judgment. Defendant's motion must be denied for these reasons and for the reasons stated in Part **III A 1 ( c )** above.


**III. B.  MR. WUTHERICH HAS HAS PRESENTED  "ENOUGH FACTS TO CREATE AN GENUINE ISSUE OF FACT" TO DEMONSTRATE AGE AND NATIONAL ORIGIN DISCRIMINATION.**

Defendant seeks summary judgment on Plaintiff's claim for age and national origin discrimination.  Defendant concedes, for this motion only, that Plaintiff has established a prima face case of discrimination.  (Defendants Brief at page 20.)

In support of its Motion for Summary Judgment Defendant says:

As set forth above, Rice had a legitimate, non-discriminatory reason for terminating Plaintiff's employment: Jenkins' search of Plaintiff's email and hard drive revealed that he wascontacting representatives of companies like Consol and Range about Drill2Frac. (Defendant's brief at 20)

Here, Plaintiff has done nothing to cast Rice's legitimate, non-discriminatory reason into doubt. (Defendant's brief at 21)

Didier is also not similarly situated to Plaintiff. In making this assessment, the court must consider "factors such as the employee's job responsibilities, the supervisors and decision makers, and the nature of the misconduct engaged in." (Defendant's brief at 22)

Plaintiff responds by saying – As set forth in section **III A 2.** above, Rice had no legitimate, non-discriminatory reason for terminating Plaintiff's employment.

Mr. Didier had a true conflict of interest. Mike Didier had a conflict by virtue of his ownership of SCS stock (Toby Rice depo at page 40) **(JA 68).** Didier and Tunde were approving SCS invoices.(Toby Rice depo at page 49, 50) **(JA 69)**

Michael Didier, was younger, and an American citizen. He was also a partial owner of SCS. (Admitted in answer to complaint at ¶71a). On *October 18, 2016,* Michael Didier received vested benefits, (Exhibit 30)**(JA 338)**, while Plaintiff did not.

Plaintiff's evidence has cast Rice's "legitimate, non-discriminatory reason" into doubt. Defendant's motion must be denied for the reasons stated in Part **III A 1 ( c )** above and for the reasons stated in Plaintiff's Brief in Support of Plaintiff's Partial Motion for Summary Judgment.

Conclusion

Defendant's Motion for Summary Judgment  must be denied.

Respectfully Submitted
BEHREND & ERNSBERGER

/s/ Daniel W. Ernsberger
Daniel W. Ernsberger

PA ID: 30703
Behrend and Ernsberger, PC
12th Floor, Park Building
355 Fifth Avenue
Pittsburgh, PA 15222
(412) 391-2515 (telephone)