UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN WUTHERICH, | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 2:18-cv-00200-CB-MPK |
| v. | ) | |
| | ) | Judge Cathy Bissoon as presider and |
| RICE ENERGY INC, a.k.a | ) | Magistrate Judge Maureen P. Kelly |
| EQT RE LLC, | ) | is Referred. |
| Defendant. | ) | |

<u>Plaintiff's Reply Brief in Support of Plaintiff's Motion for Summary Judgment</u>

Introduction

This case is a wrongful discharge claim which arises under the Sarbanes-Oxley Act, Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act, 29 U.S.C § 623 and the Pennsylvania Human Relations Act.

**I.** **Procedural summary**

The Plaintiff, Kevin Wutherich, has filed a Motion for Partial Summary Judgment. He asks the court for a Partial Summary Judgment finding that he has stated a prima facie case, and that defendant has failed to present clear and convincing evidence in support of its affirmative defense.

Defendant has filed a Response in Opposition to Plaintiff's Motion for Summary Judgment. It has presented the following issues saying:

    A.    Plaintiff cannot establish a prima facie case under SOX with respect to his alleged communications about SCS. (Defendants Response at page 2)

    B.    Plaintiff cannot establish a prima facie case under SOX with respect to Jeff Lo and EOG Resources. (Defendants Response at page 9)

    C.    Defendant has presented clear and convincing evidence that it would have terminated Plaintiff absent and alleged protected activity. (Defendants Response at page 12)

    D.    Plaintiff is not entitled to summary judgment on its age or national origin discrimination clams. (Defendants Response at page 16)

The Defendant does not dispute Plaintiff's claim that Plaintiff has established a prima facie case of age and national origin discrimination. Rather, Defendant contends that it has an affirmative defense to these claims. (Defendants Response at page 16)

**II A.**    **Plaintiff has established a prima facie case under SOX with respect to his alleged communications about SCS because Rice Energy knew or suspected that he was complaining about unlawful and unreported conflict of interest.**

Defendant presents its criticism of Plaintiff's Motion for Partial Summary Judgment and Plaintiff replies as follows:

> Defendant says: Plaintiff does not recall the exact way he talked about SCS during his meeting with Toby Rice and Tunde Ajayi. (Defendants Response at page 3)
>
>> REPLY: The exact way Mr. Wutherich talked about SCS is found in his slide presentation. On August 5, 2016, a slide presentation was scheduled in which Mr. Wutherich was to address the issue of value vs price and the continued use of SCS. (exhibit 16) **(JA 296)**; (exhibit 17) **(JA 297)**; (exhibit 18) **(JA 298)**; (exhibit 19) **(JA 299)**. The presentation had 22 slides. (exhibit 20) **(JA 300-322)**. Toby Rice understood Mr. Wutherich's presentation. At the conclusion of the presentation Toby Rice agreed that the use of SCS as a supplier was a conflict of interest. (Toby Rice depo. at page 132) **(JA 87)**. Daniel Rice was told what Mr. Wutherich said in the presentation. On August 10, five days later, a meeting was scheduled with Daniel Rice to discuss the presentation. (Toby Rice depo. at page 100) **(JA 79)** (Exhibit 20)**( JA 323 )**. Peter Foradori understood what Mr. Wutherich said in the presentation. On September 12, 2016, Peter Foradori complained of fraud and coverup. (Exhibit 24)**( JA 331)**. Bruce Jenkins knew what Mr. Wutherich said in the presentation. When Peter Foradori complained, Bruce Jenkins was assigned to investigate on behalf of the board. (Tunde Ajayi depo at page 104) **(JA 8).** On the same day Peter Foradori complained, September 12, 2016, Bruce Jenkins asked Toby Rice where he could find the slide presentation in [salesforce]. (Exhibit 22)**( JA 328)**. The slide presentation disclosed unfair bidding practices. In line 14 of the amended complaint it

states that Mr. Wutherich witnessed "unfair bidding practices".Section 404 of the Securities and Exchange Act requires there to be internal controls over multiple items including the procurement process. Mr. Wutherich's slide show presentation clearly showed that there were no effective internal controls.

Defendant says: Plaintiff admitted that he did not think that SCS was a bad vender. (Defendants Response at page 3)

> REPLY: Mr. Wutherich has never said that SCS is a bad vender. It is alleged in the complaint that Mr. Tunde Ajauy owned 25% of the shares of one of Rice Energy's suppliers , Silver Creek Services, ("SCS") (Complaint ¶ 38(b)), and Rice Energy failed to report that fact to its shareholders. (Complaint ¶ 26). The securities violation was the failure to report the conflict to the shareholders. (Complaint ¶ 26). In the deposition, Mr. Wutherich was asked whether using SCS as a vender is a violation of the law. Mr. Wutherich said "No". (Depo. Page 244.) He repeated what he said in the complaint. The violation was the failure to report to shareholders.

Defendant says: Plaintiff admits that he had "no idea" what the criteria are for determining if something has to be disclosed in Rice's 10-k (Defendants Response at page 4)

> REPLY: Mr. Wutherich had no idea of the specific criteria for disclosure of a SOX violation on a 10-k (Wutherich depo. at page 86) **(JA 111);** but, it was reasonable for him to believe that there was a SOX violation. He did have SOX training. (Wutherich depo. at pages 78-80) **(JA 110 )**. Other people at Rice Energy thought there was a conflict of interest, including, Toby Rice (Toby Rice depo. at page 132) **(JA 87)** and Peter Fiordori (Exhibit 24)**( JA 331)**. Also, Rice Energy had a history of SOX violations with BlackRock in the creation of Rice Energy. (Complaint Exhibit 1) And, the non-disclosure of SCS was suspect because, in the 2016 Proxy Statement, Rice Energy disclosed other related party transactions but did not disclose SCS. (See Complaint Exhibit 2)

Defendant says: Plaintiff can not show knowledge on the part of the decision maker Dan Rice (Defendants Response at page 5)

> REPLY: Daniel Rice initiated the investigation into SCS on or about February 16, 2106 (Exhibit 6) **(JA 279)**. Mr. Wutherich provided his slide presentation on August 5, 2016 (exhibit 16) **(JA 296);** (exhibit 17) **(JA**

**297);** (exhibit 18) **(JA 298);** (exhibit 19) **(JA 299)** and on August 10, 2016 Daniel Rice reviewed the information provided by Mr. Wutherich (Toby Rice depo. at page 100) **(JA 79)** (Exhibit 20)**( JA 323 )**.

Defendant says: Daniel Rice was not aware that Plaintiff raised and concerns about SCS. (Defendants Response at page 6)

REPLY: On August 10, five days after the slide presentation, a meeting was scheduled with Daniel Rice to discuss the SCS conflict of interest. (Toby Rice depo. at page 100) **(JA 79)** (Exhibit 20)**( JA 323 )**.

**II B.        Plaintiff has established a prima facie case under SOX with respect to Jeff Lo and EOG Resources, because Rice Energy knew or suspected that he was complaining about unlawful and unreported litigation risk.**

Defendant presents its criticism of Plaintiff's Motion for Partial Summary Judgment and Plaintiff replies as follows:

Defendant says: The court would have to assume that the data was confidential. (Defendant's Brief page 9) Rice used the data (Defendant's Brief page 10)

REPLY: The court can assume that the data was confidential because Jeff Lo was bragging how he used software at EOG to hack through EOG firewalls. (Wutherich Depo at 192) **(JA 122)** Also EOG said it is confidential. (Exhibit 47.1)(JA 379)

Defendant says: The use of the data was substantially certain to result in litigation. (Defendant's Brief page 10)

REPLY: The use of the data was substantially certain to result in litigation because EOG credits its wells with producing approximately double what their peers wells produce with shorter laterals. (Exhibit 47, 47.1)(JA 378-379) EOG says their method is confidential. (Exhibit 47.1)(JA 379) Rice Energy has given Mr. Lo credit for "managing the competitor intelligence surveillance program" and for recommending "well design changes with anticipated PV (present value) up-tick of $212 million." (Exhibit 45)(JA 376) (Toby Rice depo at page 148-151)(JA 89) See also: Martin ex rel. Situated v. GNC Holdings, Inc. 2:15-cv-01522 at page 20 (W.D. Pa., 2017)(Before making an investment decision, it is logical that a reasonable

shareholder would want to know whether a company like GNC that sells dietary supplements and sports nutrition products is compliant with applicable regulatory requirements) Id. at page 20

Defendant says: Rice Energy did not know or suspect that Mr. Wutherich engaged in protected activity. (Defendant's Brief  page 10)

> REPLY: Rice Energy did know that Mr. Wutherich engaged in protected activity because Mr. Wutherich told his supervisor, Tunde Ajayi, what he had told Jeff Lo that it was illegal, a crime was being committed. (Wutherich depo at page 200.)**(JA 124)** see also  (Wutherich depo at page 178-179.)**(JA 119)** Rice Energy suspected that Mr. Wutherich was engaged in protected activity because Rice Energy actively concealed the real reason for hiring Jeff Lo. Saying that Jeff Lo was good with Spotfire (Wutherich Depo at 170)  without telling Mr. Wutherich that Jeff Lo was good with using software to hack EOG firewalls.  (Wutherich Depo at 192) **(JA 122)**. Rice Energy suspected that Mr. Wutherich was engaged in protected activity because Rice Energy bypassed Mr. Wutherich (who was Jeff Lo's supervisor) by giving Jeff Lo "executive" projects. (Jeff Lo depo at page 72) **(JA 46)** The executives must have suspected Mr. Wutherich because Jeff Lo was transferred away from Mr. Wutherich at Jeff Lo's request (Jeff Lo depo at page 95) **(JA 50)** and a science project was initiated – by executive request -- for Jeff Lo to make a better well (Jeff Lo depo at page 60, 67, 72). **(JA 43, 45,46 )**

Defendant says: The decision maker, Daniel Rice,  was not aware of the protected activity. (Defendant's Brief  page 10)

> REPLY: It is not necessary that Daniel Rice be told directly.  Mr. Wutherich is a whistle blower because he told Tunde Ajaui, "a person with supervisory authority over the employee" ... <u>Wutherich v Rice Energy</u> Case 2:18-cv-00200-CB-MPK Document 30 Filed 10/02/18 page 6, citing 18 U.S.C. § 15143A. Nevertheless, Daniel Rice must have known or suspected protected activity because Kevin Wutherich stopped a science project which was then re-started by executive order of Derek Rice.  Kevin Wutherich had taken the science project down a certain path but "completed" the project. (Jeff Lo depo at page 73) (JA 46) It was re-opened as an "executive project" by Derek Rice and given to Jeff Lo. (Jeff Lo depo at page 71-72) (JA 46) Also, Jeff Lo was transferred (at Jeff Lo's request) so that he would no longer report to Kevin Wutherich. (Jeff Lo depo at page 95) **(JA 50)**

>Defendant says: There is no evidence that Plaintiff's alleged communication about Jeff Lo and the alleged EOG data contributed to his termination. (Defendant's Brief page 11)
>
>>REPLY: The Plaintiff was terminated so that Jeff Lo could finish his work with the EOG data.  Jeff Lo is now given credit for ""Manage[ing] competitor intelligence surveillance program using data analytics to benchmark performance and identify potential improvements/investment opportunities; routinely presented detailed competitor analysis to executives and guided recommendations for future science tests."(Toby Rice depo page 148) **(JA 89)** Jeff Lo is given credit for "Deliver[ing] monthly updates directly to executives and senior management on current development science project proposals and well performance analysis."."(Toby Rice depo page 149) **(JA 89)** Jeff Lo is given credit for "provid[ing] analytical support to teams across disciplines on science tests and production response, recommended well design changes with anticipated [present value] up tick of $212,000,000." (Toby Rice depo page 148) **(JA 89)**  Rice Energy never reported the theft of trade secrets to shareholders. (Admitted in answer to complaint at ¶54)

**II C.        Defendant has failed to present clear and convincing that it would have terminated Plaintiff absent and alleged protected activity.**

Defendant presents its criticism of Plaintiff's Motion for Partial Summary Judgment and

Plaintiff replies as follows:

>Defendant says: Rice legitimately terminated Plaintiff's employment because it determined, based on an investigation conducted by someone [Bruce Jenkins] with no knowledge or any of Plaintiff's alleged protected activity ... (Defendant's brief at page 12)
>
>>REPLY: The facts to not support that conclusion that Defendant seeks. Mr. Jenkins was the internal auditor.  He had knowledge of Plaintiff's protected activity. See "<u>Plaintiff's Brief in Opposition of Defendant's Motion for Summary Judgment</u>" at pages 28-30
>
>Defendant says: Plaintiff omits the fact that, in 2015, it was Toby Rice's understanding that Plaintiff's position would be in an advisory roll without any compensation. Specifically, Mr. Toby Rice said was "I mean, the fact that there was compensation going on was different than what I imagined,..." (J.A. Ex. F, Toby Rice Tr. at 136). **(JA 88)** (Defendant's brief at page 13)

> REPLY: What Toby Rice "imagined" is not relevant, because, in 2015, Mr. Wutherich followed the disclosure rules. In 2015, Toby Rice approved the work as an advisor. He said that Mr. Wutherich should report it to Coach Reichman in Human Resources. (Toby rice Depo at 123,124)**(JA 85).** Mr. Wutherich sent Coach Reichman and email stating that he had been offered a position at Drill to Frac and asked whether this would raise any issues of conflict of interest. (Toby Rice 126)**( JA 85)** Mr. Wutherich asked "Please let me know your thoughts, and if there is a potential conflict of interest that would prohibit this type of relationship.." (Exhibit 28, Exhibit 49). (Same exhibit with 2 exhibit numbers) **(VA 335, 385)** Toby Rice's reason for termination is not legitimate because, according to the employee handbook, all the employee has to do is report the potential conflict to his supervisor. (Rice 4)**(JA 185)**. Mr. Wutherich reported it in writing and asked if there was a conflict of interest. **(VA 335, 385)**. The supervisor is to take it from there. (Rice 4)**(JA 185)** If Coach Reichman gave approval, [because he did not follow through on the conflict disclosure],Toby Rice own's it. (Toby Rice depo. at 204) **(JA 99)** Mr. Wutherich was to report any conflicts to his supervisor in writing and he did that.

Defendant says: Defendant produced certain draft emails during discovery, and that Mr. Wutherich's email to Coach Reichman was a draft email not sent. (Defendant's brief at page 13-14)

> REPLY: Defendant now claims that Mr. Wutherich's email to Coach (Exhibit 28) is a draft email that was never sent. This is a surprise. Defendant produced the document in the case without a warning that it was draft email. Toby Rice looked at the email to Coach Reichman (Exhibit 28) during his deposition. Defendant did not object to the presentation of the email to Toby Rice. Toby Rice looked at the email and the exhibit refreshed his recollection as to what happened in 2015:
>
> | | |
> |---|---|
> | Q | Okay. Do you recall -- now that you've looked at this piece of paper dated October 2nd, 2015, does that refresh your recollection as to when you first talked to Kevin about Drill2Frac? |
> | A | Yeah. I think that Kevin would have had a conversation with me before he had any agreement with -- before he would accept anything else with the company. So here he is saying that he's going to be on the advisory board there. So I would say that our conversation most likely was before this. |
> | Q | Okay. So to your best understanding, you had a conversation with Kevin Wutherich about Drill2Frac before October 2nd, 2015? |
> | A | Yeah, most likely. That's probably when it was but, like I said, I can't remember the specific date. |
>
> (Toby Rice Depo pages 123-124) **(JA-85)**
> Toby Rice's personal recollection confirmed the fact that Mr. Wutherich

> made his first disclosure sometime before October 2nd 2015, and not October 17, 2016. Defendants recent revelation that the email was a "draft" email that was never sent does not withstand scrutiny.  Exhibit 28 **(JA-335)** speaks for itself.   It says **"**<u>Sent: 10/2/2015 4:19:01 PM</u>**"**

Defendant says: plaintiff's proof that the forensic computer analysis was corrupt at the time the decision was made to terminate Mr. Wutherich has no basis in the record. (Defendant's brief at page 14)

> REPLY: There is clear evidence in the record that the forensic computer analysis of Mr. Wutherich's computer was corrupt at the time the decision was made to terminate Mr. Wutherich.  (Bruce Jenkins Depo pages 78) **(JA-27)**
>
> | | |
> |---|---|
> | Q | -- does this tell us that "We" -- meaning you, Bruce Jenkins -- "received a new image of the Wutherich computer around 6 p.m. last night and after reviewing the size of the image files compared to the ones from the corrupted computer image we found that the new image is approximately 100 gigabytes larger than the previous image files"? Does it say that? |
> | A | That is what the e-mail states in that exhibit. |
> | Q | And it goes on and says, "Due to the enormous size difference between the latest image, which appears to be a 100 percent complete image of the computer, as compared to the previous incomplete images, we will start our analysis over completely to ensure thoroughness with the Kevin Wutherich primary computer." Is that what it says? |
> | A | That is what that exhibit says. |
>
> (Bruce Jenkins Depo pages 78) **(JA-27)**
>
> There is also evidence in the record that the email produced by the defendant is fake email.
>
> | | |
> |---|---|
> | Q | Exhibit 50 is not legitimate? |
> | A | That is correct. |
> | Q | Okay. That leads me to my next question. It appears that you and Mr. Jordan were aware of the existence of Mr. Wutherich's e-mail between 2:17 p.m. and 8:43 p.m. and this other non-legitimate e-mail was created at 6:12 p.m.; is that right? |
> | A | No. |
> | Q | You're saying that this non-legitimate e-mail was created at sometime other than 6:12 p.m.? |
> | A | I have no idea when it was created. You would need to engage a forensic specialist to identify that. |
> | Q | Did you create Exhibit 50, the non-legitimate e-mail? |
> | A | I did not. |
> | Q | Do you know whether Will Jordan created Exhibit 50, the non-legitimate e-mail? |
> | A | I do not. |
> | Q | Who else would have access to Mr. Wutherich's original other than you and Will Jordan? |
> | A | IT administrators. I mean, I have no idea. |
>
> (Bruce Jenkins Depo pages 63-64) **(JA-26)**

Mr. Jenkins explains that Exhibit 50 is fake because "EQT" appears in the document.  He says that is not possible because the email was created before the merger.

| | |
|---|---|
| Q | Now I'm trying to get to the alteration. If you look at Exhibit 50, there's that sentence removed. The sentence was removed at about 6:12 p.m. on that same day. Do you agree? That's when it was sent. |
| A | I do not agree. Again, if I can state my credentials, I'm a certified information systems security professional. That means I have IT experience. If you look at the header of this file, it references brjenkins@eqt.com. There was no eqt.com in 2016. That means that this e-mail is not legitimate. |
| Q | Exhibit 50 is not legitimate? |
| A | That is correct. |

If we accept Mr. Jenkins explanation, that Exhibit 50 is fake because "EQT" appears in the document, then substantially all the documents produced by Rice Energy in this case are fake because they contain the notation "EQT".  See **JA - 277, 279, 280, 282, 283, 285, 291, 292, 295, 296, |297, 298, 299, 323, 324, 328, 332, 333, 334, 335, 297, 298, 299, 323, 324, 328, 332, 333, 334, 335, 336, 337, 343, 345, 354, 372, 373, 375, 385, 386, 414, 429, 443, 444, 446, 447, 450, 456, 501**)

This issue in Plaintiff's Partial Motion for Summary Judgment is whether Defendant has clear and convincing evidence that it's termination of Mr. Wutherich was based on a factor other than SOX retaliation.  The corrupt computer image and fake email can not be used by Defendant to prove its affirmative defense with clear and convincing evidence.

**II D.        Plaintiff is entitled to summary judgment on his age and national origin discrimination claims.**

Defendant has offered no opposition to Plaintiff's Partial Motion for Summary Judgment seeking the courts finding that Plaintiff has stated a prima facie case of age and national origin discrimination.  Plaintiff requests Partial Summary Judgment on this issue.

Plaintiff has also requested Partial Motion for Summary Judgment on Defendant's affirmative defense to Plaintiffs claim for age and national origin discrimination.   Defendant repeats the affirmative defense it offered to the SOX retaliation claim.

9

Plaintiff replies by saying that Mr. Kevin Wutherich is entitled to Summary judgment on the Defendant's second affirmative defense relating to age and national origin discrimination for the same reasons offered in the SOX retaliation claim.

## Conclusion

Plaintiff requests that Partial Motion for Summary Judgment be entered against the defendant on the liability issues and that the case be listed for assessment of damages.

Respectfully Submitted
BEHREND & ERNSBERGER

/s/ Daniel W. Ernsberger
Daniel W. Ernsberger

PA ID: 30703
Behrend and Ernsberger, PC
12th Floor, Park Building
355 Fifth Avenue
Pittsburgh, PA 15222
(412) 391-2515 (telephone)