**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEVIN WUTHERICH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 18-200 |
| | ) | District Judge Cathy Bissoon |
| v. | ) | Magistrate Judge Maureen P. Kelly |
| | ) | |
| RICE ENERGY INC. *also known as* EQT RE | ) | Re: ECF Nos. 73 and 75 |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

I.   **RECOMMENDATION**

Plaintiff Kevin Wutherich ("Wutherich") brings this case against Rice Energy Inc., also known as EQT RE LLC ("Rice"), arising out of allegations that Rice unlawfully terminated his employment. There are two dispositive motions before the Court. Wutherich filed a Motion for Partial Summary Judgment. ECF No. 73. Rice filed a Motion for Summary Judgment. ECF No. 75. For the reasons set forth herein, it is respectfully recommended the Court grant Rice's Motion for Summary Judgment and deny Wutherich's Motion for Partial Summary Judgment.

II.   **REPORT**

A.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

1.  **Wutherich's Employment at Rice**

Rice is an energy company with a class of securities registered under section 12 of the Securities Exchange Act of 1934. ECF No. 71 ¶ 17. Rice became a wholly-owned subsidiary of EQT Corporation in November 2017. Id.

Rice hired Wutherich in May 2015 as its Director of Completions.  Id. ¶¶ 8-9.  After a gas well is drilled and completed, the Completions Department is responsible for connecting the well bore to the reservoir, which includes hydrofracturing.  Id. ¶ 11.  Wutherich managed the operations of this department, and its approximately ten employees, all of whom reported to Wutherich either directly or indirectly.  Id. ¶¶ 10-11.  Wutherich reported to Vice President of Completions, Babatunde Ajayi ("Ajayi"), who in turn reported to Toby Rice, the Chief Operating Officer ("COO").  Id. ¶¶ 6, 15, 16.

Upon hiring, Wutherich received an offer letter, which stated that he would "devote [his] full business time, best efforts, skill, knowledge, attention, and energies to the advancement of the Company's business activities . . . and to the performance of [his] duties and responsibilities as an employee of the Company and not engage in any other business activities without prior approval of the Company."  Id. ¶ 12.

### 2.  EOG Resources

Wutherich supervised Jeff Lo ("Lo"), who worked as an engineer at EOG Resources ("EOG") prior to his employment with Rice.  Id.  ¶¶ 26-27.  In July 2016, Wutherich overhead Lo and Derek Rice "discussing data which Mr. Lo obtained from his previous employer."  Id. ¶ 25; ECF No. 77 ¶ 12.[1]  Wutherich recalls "hearing something about a drive . . . filled with data," and he "believe[s] [Lo] made a statement at one point that it contained well files."  ECF No. 71 ¶¶ 28-30.  Wutherich does not recall what Lo and Derek Rice intended to do with this data, and he did not personally see the content.  Id.  ¶¶ 29-30.

Afterwards, Wutherich approached Lo.  Wutherich told Lo that he had overheard his conversation with Derek Rice, and he "remember[s] telling [Lo] that it was illegal" and that Lo

---

[1] Wutherich did not file a response to Rice's Concise Statement of Material Facts, ECF No. 77, pursuant to Local Civil Rule 56(C).  Accordingly, the facts set forth in Rice's Concise Statement of Material Facts are deemed admitted.  See, e.g., Gulley v. Haymaker, No. 06-131J, 2009 WL 763549, at *2 (W.D. Pa March 23, 2009).

could go to jail for his actions.  Id. ¶ 31.  Wutherich concluded this based on a "rumor" he heard regarding an employee at his former company who was incarcerated for stealing company data. Id.  According to Lo, he claimed to have consent to use the information and denied that it was confidential.  ECF No. 79-1 at 47.

Wutherich reported this incident to Ajayi.  ECF No. 71 ¶ 32.  He told Ajayi something "very close to what [he] told Jeff [Lo] himself," specifically, "that it's illegal, that it's a crime being committed" and he "remember[s] telling [Ajayi] that—talking about the Rice brother throwing him under the bus."  Id. ¶ 33.

Wutherich did not report this incident to anyone other than his supervisor, Ajayi.  Id. ¶ 34.  Ajayi did not report this incident to anyone else or take any further action.  Id. ¶¶ 35-36. Wutherich has "no direct knowledge" how anyone other than Ajayi would have knowledge regarding his concerns about the EOG data that Lo discussed.  ECF No. 77 ¶ 17.

Lo was subsequently transferred to the reservoir engineering department, at Lo's request. ECF No. 79-1 at 50, 95:16-23.  In the fall of 2016, Rice conducted a "science experiment" using a modified completion design for fracturing.  ECF No. 71 ¶ 38.

### 3.  Silver Creek Services

#### a.  Ajayi's Ownership Interest in Silver Creek

Ajayi owned twenty-five percent of Silver Creek Services ("Silver Creek").  Id. ¶ 40. Because Silver Creek was a service provider for Rice, providing over $1 million in aggregate services, his ownership interest created a conflict of interest for Ajayi.  Id. ¶¶ 39, 43.  Rice did not disclose a related party transaction with Silver Creek on its 2016 Proxy Statement.  Id. ¶ 66.

### b.   Internal Reporting of Ajayi's Ownership Interest

Ajayi informed Rice's Chief Executive Officer ("CEO"), Daniel Rice, of his ownership in Silver Creek in 2014, before Rice used Silver Creek as a service provider.  Id. ¶ 45; ECF No. 79-1 at 4, 35:25-36:3.   Ajayi requested Daniel Rice's permission for Rice to utilize Silver Creek's services in June or July 2014.  ECF No. 71 ¶ 45; ECF No. 79-1 at 4, 36:10-18.  Later, in September 2015, Rice conducted a conflict of interest survey among its employees.  ECF No. 71 ¶ 47.  Ajayi disclosed that he had a twenty-five-percent ownership interest in Silver Creek.  Id.; ECF No. 79-1 at 132.

According to Ajayi, a "tough procurement cycle" arose in 2015, in which Rice would need to consider whether to continue using Silver Creek products and whether the quality of those products was worth the price.  ECF No. 79-1 at 5, 43:12-20.  Ajayi took Wutherich and other members of his team to lunch to disclose that he had an ownership interest in Silver Creek. Id. at 44:15-20; ECF No. 71 ¶ 46.

Bruce Jenkins ("Jenkins"), Rice's Director of Internal Audit, testified that by 2015 "virtually everyone in the company and certainly everyone in the completions department" was aware of Ajayi's ownership interest in Silver Creek, and it was "common knowledge that was spoken about amongst team members."  ECF No. 71 ¶ 49; ECF No. 79-1 at 29, 101:22-102:6.

Ajayi began the process of selling his Silver Creek shares in November or December 2015.  ECF No. 71 ¶ 64.  Thereafter, COO Toby Rice was continually in contact with Ajayi about selling his shares and Ajayi "was being pressured at some point" to do so.  Id. ¶ 65.

### c.   Wutherich's Communications Regarding Silver Creek

In the summer of 2016, Rice issued a request for quotes ("RFQ") for service providers, including providers of frac plugs, flow back services, sand trucking, and well heads.  Id. ¶¶ 51-

52. Wutherich was involved in the RFQ process, along with the engineers who reported to him.

Id. ¶ 53.

    During the RFQ process, Wutherich told Ajayi that he did not think Silver Creek should be used as a service provider.  ECF No. 79-1 at 128, 223:10-23.  He "does not recall exactly what [he] told [Ajayi], other than a disagreement with the decision" to select Silver Creek as a service provider.  ECF No. 71 ¶ 54.

    In early August 2016, Wutherich participated in a meeting with Ajayi and Toby Rice about the RFQ process.  Id. ¶ 55.  Wutherich gave a PowerPoint presentation, in which he discussed various service providers and provided an overview of the RFQ process.  Id. ¶ 56. Wutherich testified regarding this presentation:

> Based on what I see here, I would have gone through those points [in the PowerPoint presentation.]  I would have stated that I disagree with those points, but in the end, the incumbent one [sic], as I stated in one of my other things, I recall doing air quotes that the incumbent insinuating that—well, I'll just leave it at that.  I won't say what I was insinuating because it could be interpreted differently.

Id. ¶ 57; ECF No. 79-1 at 128, 224:9-19.

> Q.  Okay.  And when you were giving the disagreement over Silver Creek with respect to the frac stacks/wellheads or plugs, you were giving particulars as to why you thought there was other business reasons to be using other vendors besides Silver Creek?
>
> A.  I . . . insinuated that it was being done because of the relationship with Silver Creek.
>
> Q.  And how did you insinuate it? I don't know what that means.
>
> A.  That's, as I said, the sort of air quotes.  It's going to be talking through, as I talk through it.  Again, I do not recall the exact way I talked it, but I believe the— the way I discussed who won it and my body language, from what I recall, was very clear that the reason they got the work was because of the relationship between Silver Creek and [Ajayi].

ECF No. 79-1 at 130, 230:10-231:2.

Wutherich did not indicate that it was illegal to use Silver Creek as a service provider, and he did not believe that it was a violation of law. Id. at 128-129, 224:20-225:5. He "thought there [were] other vendors that were better," however, and he indicated that at the meeting. Id. at 129, 225:1-8. Wutherich agreed with choosing Silver Creek as a vendor with respect to some services it offered, but he believed that Silver Creek had been chosen with respect to two services, the frac stacks and plugs, for the "wrong reasons." Id. at 129, 228:10-22.

On October 3, 2016, Wutherich emailed COO Toby Rice. ECF No. 79-1 at 332. In his email, Wutherich indicated that a price adjustment and lock in had been negotiated for Silver Creek. Id. Wutherich stated "[w]e would like to lock in these new prices ASAP as we will see some significant savings, however, Nehemiah mention [sic] that we did not get an official OK from you yet, and needed to get that before we send back to them the amended MSA." Id. Toby Rice responded that "we are not able to lock in as long as there are conflicts. Bruce [Jenkins] will provide the ok." Id.

### d.  Other Employees' Communications About Silver Creek

According to Wutherich, "multiple" other Rice employees voiced disagreement over Silver Creek, including Andrew Sorg and Adam Hughey. ECF No. 71 ¶ 59. At various times, Rice employees Peter Foradori, Nehemiah Katz, and Jeb Bolton each approached Jenkins to discuss Silver Creek and concerns over Ajayi's relationship and the amount of money being spent at Silver Creek. Id. ¶ 62; ECF No. 79-1 at 29-30, 102:14-15, 103:2-8.

### e.  Michael Didier

Another Rice employee, Michael Didier ("Didier"), also had an ownership interest in Silver Creek. ECF No. 71 ¶ 41. Rice had knowledge of Didier's ownership interest. ECF No. 77 ¶ 65. Rice moved to remove the conflict by encouraging him to sell his ownership interest in

6

Silver Creek.  Id. ¶ 66.  Instead of selling his shares in Silver Creek, Didier resigned on October 21, 2016.  Id. ¶ 67; ECF No. 78-1 ¶ 5.  Didier is an American citizen and was born in 1978, making him approximately three years younger than Wutherich.  ECF No. 78-1 ¶ 3.

### 4.  Drill2Frac

#### a.  Wutherich's Role with Drill2Frac

On September 30, 2015, the CEO of Drill2Frac, an oilfield services company, contacted Wutherich to inquire into adding him as a board advisor, or in another role, with Drill2Frac. ECF No. 71 ¶ 18.  Drill2Frac was a service provider for Rice.  Id. ¶ 24.

The next month, Wutherich entered into an "Agreement for Board Advisor Membership Consulting Services" with Drill2Frac.  Id. ¶ 19.  In connection with this role, Wutherich agreed to complete various tasks, including that he would participate as a member of the Board of Advisors for Drill2Frac; provide technical and management advice related to its products and services; assist Drill2Frac in the development of materials for its clients; provide referrals of customer leads and create awareness of company services; and create "brand awareness" of Drill2Frac.  Id. ¶ 20.  Drill2Frac agreed to compensate Wutherich for his services, including a monthly retainer fee and referral fees.  Id. ¶ 21.

Wutherich informed COO Toby Rice and Ajayi, Wutherich's supervisor, that he accepted a position on the advisory board for Drill2Frac.  Id. ¶ 23.  Ajayi and Toby Rice were not aware that Wutherich was being compensated for this work.  ECF No. 79-1 at 10-11; ECF No. 77 ¶¶ 3-4.

Wutherich claims that he also notified a human resources employee, Coach Rikeman ("Rikeman"), of his position with Drill2Frac and asked whether there was a "potential conflict of interest that would prohibit this type of relationship."  ECF No. 74-1 ¶ 32; ECF No. 79-1 at 335.

Rice disputes this notification occurred, citing as evidence the email that Wutherich relies upon was only located in draft form in his email account; the email was not found in Rikeman's email inbox; and Rikeman does not recall receiving or responding to the email.[2]  ECF No. 81 ¶ 32; ECF No. 82-1; ECF No. 82-2 at 4.  In the disputed email at issue, Wutherich states that he has been asked to be on an executive advisory board and does not specifically discuss financial compensation.  ECF No. 79-1 at 335.[3]

### b.  Rice's Investigation and Wutherich's Termination

In October 2016, COO Toby Rice instructed all Rice employees to disclose any previously undisclosed conflicts of interest to Jenkins.  ECF No. 77 ¶ 39.  In response, on October 17, 2016, Wutherich informed Jenkins by email of his relationship with Drill2Frac and that he was receiving a referral fee for clients that contracted with Drill2Frac.  Id. ¶ 40.

Jenkins initiated an investigation, which included his review of the contents of Wutherich's email inbox and hard drive.  Id. ¶ 41.  At this time, Jenkins was not aware of Wutherich raising concerns about using Silver Creek as a service provider or that he had communicated regarding Lo and the EOG data.  Id. ¶¶ 44-45; ECF No. 79-1 at 23, 35:4-8, 38:4-11.

Jenkins discovered emails showing that Wutherich was contacting representatives of other energy companies regarding Drill2Frac.  ECF No. 77 ¶ 42.  As a result of his investigation, Jenkins understood that no one at Rice was aware of the extent of Wutherich's relationship with

---

[2] In his Reply in support of his Motion for Partial Summary Judgment, Wutherich asserts that Rice's claim this is a draft email is a "surprise."  ECF No. 85 at 7.  However, counsel for Rice has submitted a letter to counsel for Wutherich dated July 31, 2019, which was sent pursuant to "Judge Kelly's directive at the July 29 status conference regarding the issue of unsent emails that were included as part of Rice's document production in this case."  ECF No. 82-3 at 2-3.  It includes a list of documents that were "in draft form and never sent," including this email to Rikeman.  Id. at 3 (listing document bates labeled as Rice 00009894); ECF No. 79-1 at 335 (email to Rikeman, bates labeled as Rice 00009894).  Counsel for Wutherich does not address this letter in his briefing.

[3] In this document, Wutherich indicates that he has been approached by an oilfield service provider, VES.  Wutherich represents that in 2015, Drill2Frac went by Vorpal Energy, or "VES."  ECF No. 74-1 ¶ 39.

Drill2Frac, beyond Toby Rice's approval for Wutherich to sit on Drill2Frac's board.  Id. ¶ 48; ECF No. 79-1 at 25, 57: 7-12.

Jenkins conveyed his findings to the members of the Rice executive team, including CEO Daniel Rice.  ECF No. 77 ¶ 49.  Based on the results of the investigation, Daniel Rice concluded that Wutherich was "abusing his role at Rice for his personal benefit, and [that] it was a clear violation of [Rice's] conflict of interest policy.  Id. ¶ 50.  He determined that Wutherich was using proprietary information related to Rice's trial of Drill2Frac as a marketing tool to help sell Drill2Frac's product to competitors in exchange for compensation.  Id. ¶ 51.  As a result, Daniel Rice concluded that Wutherich was profiting by using Rice's information, and he decided to terminate Wutherich's employment.  Id. ¶ 67; ECF No. 71 ¶ 67. Wutherich was terminated on October 31, 2016.  ECF No. 71 ¶ 68.

Wutherich is of Canadian national origin and is a green card holder.  ECF No. 71 ¶ 4.  He was 41-years old at the time Rice terminated him from his position.  Id. ¶ 2.  He was replaced by an internal candidate who was a twenty-nine year old American citizen.  ECF No. 12 ¶ 72; ECF No. 34 ¶ 72.

### 5. Ajayi's Termination

Ajayi was terminated on the same date as Wutherich.  ECF No. 77 ¶ 59.  Rice conducted an investigation regarding Ajayi's conflicts of interest, which revealed that he had an undisclosed relationship with Parco Slickline, a Rice vendor.  Id. ¶ 58; ECF No. 79-1 at 31, 110:7-111:11. Ajayi was terminated for failing to disclose this relationship.  ECF No. 77 ¶ 59.

Ajayi is an American citizen and was thirty-one at the time of his termination.  ECF No. 71 ¶¶ 7, 70.  He was replaced by Steven Ko, a Canadian.  ECF No. 77 ¶¶ 61-62.

**6. Procedural History**

Wutherich filed his Complaint on February 14, 2018.  ECF No. 1.  Rice filed a Partial Motion to Dismiss on April 16, 2018.  ECF No. 5.  On May 4, 2018, Wutherich filed the operative First Amended Complaint (the "Amended Complaint").  ECF No. 12.  Therein, he brings the following claims: Count I - retaliation in violation of the Sarbanes-Oxley Act of 2002 ("SOX"); Count II - retaliation in violation of the Dodd-Frank Act ("Dodd-Frank"); Count III - age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); Count IV - nationality discrimination in violation of Title VII; and Count V - age and nationality discrimination in violation of the Pennsylvania Human Relations Act ("PHRA").

On May 7, 2018, the then-pending Partial Motion to Dismiss was denied as moot.  ECF No. 13.  On May 21, 2018, Rice filed a Partial Motion to Dismiss and a Brief in Support, seeking dismissal of a portion of the SOX retaliation claim (Count I) and all of the Dodd-Frank retaliation claim (Count II).  ECF Nos. 14 and 15.  On October 2, 2018, a Report and Recommendation was filed, recommending that the Partial Motion to Dismiss be denied as to Count I and granted as to Count II.  ECF No. 30.  Thereafter, District Judge Cathy Bissoon entered a Memorandum Order adopting the Report and Recommendation and dismissing Count II.  ECF No. 33.

The parties conducted extensive discovery.  On October 15, 2019, Wutherich filed the instant Motion for Partial Summary Judgment, Brief in Support, and Statement of Facts Viewed in a Light Most Favorably to Defendant.  ECF Nos. 73, 74 and 74-1.  Rice filed a Response in Opposition to the Motion for Partial Summary Judgment, a response to Wutherich's statement of facts, and a supplemental appendix in support.  ECF Nos. 80, 81 and 82.  Plaintiff filed a Reply.  ECF No. 85.

On October 15, 2019, Rice filed a Motion for Summary Judgment and Brief in Support. ECF Nos. 75 and 76.  Rice additionally filed a Concise Statement of Material Facts and Appendix.  ECF Nos. 77 and 78.  Wutherich filed a Brief in Opposition.  ECF No. 83.  Rice filed a Reply.  ECF No. 84.

The parties filed a Joint Statement of Undisputed Facts and Joint Appendix in support of their respective motions.  ECF Nos. 71 and 79-1.[4]

The Motions for Summary Judgment are ripe for consideration.

**B.  STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure provides that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof").  Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 322; see also Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004).  "[W]hen the

---

[4] The appendix at ECF No. 79-1 is filed under seal.  A redacted version of this document is filed at ECF No. 70-1.

moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)) (internal quotations omitted).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  Matreale v. N.J. Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

## C.  DISCUSSION

### 1.  Rice's Motion for Summary Judgment

#### a.  SOX Claim (Count I)

Rice moves for summary judgment with respect to Count I.  In Count I, Wutherich seeks relief pursuant to Section 806 of SOX, 18 U.S.C. § 1514A, "Civil action to protect against retaliation in fraud cases," which provides, in pertinent part:

> (a)  Whistleblower protection for employees of publicly traded companies. No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--

12

(1)   to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C.] section 1341[mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by--

(A)  a Federal regulatory or law enforcement agency;

(B)  any Member of Congress or any committee of Congress; or

(C)  a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2)  to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1349, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A.

In order to establish a *prima facie* case for retaliation in violation of SOX arising out of each of these events, Wutherich must allege that he "(1) engaged in a protected activity; (2) [t]he respondent knew or suspected that the employee engaged in a protected activity; (3) [t]he employee suffered an adverse action; and (4) [t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action." Wiest v. Lynch ("Wiest I"), 710 F.3d 121, 129 (3d Cir. 2013) (quoting 29 C.F.R. § 1980.104(e)(2)(i)-(iv)) (internal quotations omitted).

If Wutherich satisfies his burden to identify evidence in support of all four elements, the burden then shifts to Rice to demonstrate "by clear and convincing evidence that [it] would have taken the same [adverse] action in the absence of any [protected activity.]" Wiest v. Tyco

Electronics Corp. ("Wiest II"), 812 F.3d 319, 329 (3d Cir. 2016) (quoting 29 C.F.R.§ 1980.109(b)) (internal quotations omitted).

Here, Wutherich claims that he engaged in two separate whistleblowing events under SOX: (1) his communications to COO Toby Rice and Ajayi regarding Silver Creek; and (2) his communications regarding Lo's acquisition of data from EOG.  In support of its Motion for Summary Judgment, Rice argues that Wutherich cannot satisfy his *prima facie* case, and that it would have terminated Wutherich regardless of his alleged protected activity.  For the reasons discussed below, Wutherich cannot satisfy his *prima facie* case with respect to his communications regarding either of his two alleged whistleblower events, and his SOX claim should be dismissed.

### (1)  Silver Creek

#### (a)  Protected activity

In order to establish the first element of his *prima facie* case, Wutherich "must identify evidence in the record from which a jury could deduce . . . [he] 'engaged in a protected activity' under Section 806."  Westawski v. Merck & Co., Inc., 739 F. App'x 150, 152 (3d Cir. 2018) (quoting Wiest II, 812 F.3d at 329).  In support of its Motion for Summary Judgment, Rice contends that Wutherich's communications regarding Silver Creek are not protected activity. Wutherich may have expressed his disagreement with using Silver Creek for certain services, it argues, but he never conveyed a reasonable belief that Rice violated any of the enumerated provisions under Section 806.  ECF No. 76 at 15.  Specifically, Wutherich never told anyone that (1) it was illegal to use Silver Creek; (2) that it was a securities violation to use Silver Creek; or (3) that Ajayi's relationship with Silver Creek needed to be disclosed in an SEC filing.  Id. at 16. Rice further argues there is no evidence Wutherich subjectively believed Rice engaged in a

securities violation, noting that Wutherich has "no idea" what the criteria is for making Form 10-K disclosures, and it is "hard, if not impossible, for someone to hold a subjective belief of a violation if they have no understanding of the law."  Id. (quoting Barrick v. PNGI Charles Town Gaming, LLC, 365 F. Supp. 3d 672, 684 (N.D. W.Va. 2019)).  Finally, Rice asserts that it was common knowledge at Rice that Ajayi owned a 25% share of Silver Creek. ECF No. 76 at 17.  To the extent that Wutherich claims to have reported on a conflict of interest, then, he did not provide any previously unknown information and is not entitled to whistleblower protection.  Id.

In his Brief in Opposition, Wutherich asserts that he only needs to "provide information" that he reasonably believes constitutes a securities violation in order to engage in protected activity under 18 U.S.C. § 1514A(a)(1). [5]  ECF No. 83 at 8.  Here, he "provided information" that certain Silver Creek products were overpriced.  Id. at 9.  This pertains to a potential securities violation, he argues, because Rice was planning to lock in the price of a supplier that had a related party conflict.  Id. at 8 n. 6.  He argues that the information he provided is relevant to Instruction 7 of 17 C.F.R. § 229.404 ("Item 404"), which indicates that certain relationships do not need to be disclosed if "[t]he transaction is one where the rates or charges involved in the transaction are determined by competitive bids . . . ."  Id.  Because Wutherich's "value vs. price" presentation demonstrated the rates were not "competitive," he argues, the transaction should have been reported to shareholders.  Id.[6]

---

[5] The Court notes that Wutherich's thirty-one page Brief in Opposition fails to comply with this Court's twenty-five page limit for responsive briefs.

[6] Wutherich argues that he is a whistleblower pursuant to 18 U.S.C. § 1514A(a)(1) in the body of his brief.  In a footnote, he states that he "has also a section (2) whistleblower" claim.  Wutherich claims that he satisfies subsection (2) because his spoke out and said "'[w]hat you are doing is wrong' by identifying conduct that falls within the ample bounds of the anti-fraud laws."  ECF No. 83 at 9.  18 U.S.C. § 1514A(a)(2) relates to individuals that initiate or cooperate in proceedings that are filed or about to be filed.  Wutherich does not identify any proceeding at issue and this section therefore does not apply.  Moreover, the Court notes that counsel places the phrase "[w]hat you are doing is wrong" in quotes but does not cite the source of this quote.  There is no indication that Wutherich actually made this statement, and he makes no effort to explain how his actual communications

In reply, Rice contends that Wutherich's account is a post-hoc reimagining of the underlying communication, and it not sufficient for him to claim he believed a securities violation existed after the fact.  ECF No. 84 at 4.  Rice argues that Wutherich does not cite anything to support that he subjectively believed, at the time he made the communication, that Rice did, or was about to, engage in a securities violation.  Id.  Moreover, it argues, the presentation Wutherich provided did not conclude the bid was not "competitive;" it merely addressed the service providers and provided an overview of the RFQ process.  Id.  Because Wutherich's argument ignores the fact that there was a competitive RFQ process, any belief Wutherich may have had is objectively unreasonable.  Id.

 Upon review, Wutherich did not engage in protected activity with respect to his communications regarding Silver Creek.  In order to engage in protected activity, an employee must have "both a subjective and an objective belief that the conduct that is the subject of the communication relates to an existing or prospective violation of one of the federal laws referenced in § 806."  Wiest I, 710 F.3d at 134.  "A belief is objectively reasonable when a reasonable person with the same training and experience as the employee would believe that the conduct implicated in the employee's communication could rise to the level of a violation of one of the enumerated provisions in Section 806."  Id. at 132.

Although Wutherich argues that he "provided information" relevant to whether Ajayi's relationship with Silver Creek needed to be disclosed, he does not proffer evidence that he reasonably believed he was reporting a securities violation under Section 806.  Under Section 806, it is not sufficient to simply "provide information" relevant to making a Form 10-K

---

satisfy subsection (2).  Rather, this appears to be a reference to the United States Court of Appeals for the Third Circuit's decision in Wiest I, in which the court explained that "the purpose of [w]histleblower statutes like SOX § 806 is to protect people who. . . stand against institutional pressures and say plainly, 'what you are doing here is wrong.'"  Wiest I, 710 F.3d at 132 (quoting dissenting opinion) (internal quotations omitted).

disclosure. The "'critical focus is on whether the employee *reported conduct* that he or she *reasonably believes* constituted a violation of federal law.'" Villanueva v. U.S. Dep't of Labor, 743 F.3d 103, 109-10 (5th Cir. 2014) (quoting Sylvester v. Parexel Int'l, LLC, No. 07-123, 2011 WL 2517148, at *15 (Dep't of Labor May 25, 2011)). While an employee "'need not cite a code section he believes was violated in his communications to his employer . . . the employee's communications must identify the specific conduct that the employee believes to be illegal.'" Id. (quoting Welch v. Chao, 536 F.3d 269, 276 (4th Cir. 2008)). Here, the "specific conduct" that Wutherich identified as "wrong" was Rice's selection of Silver Creek to provide certain services—not the possibility that Rice would fail to report this transaction to shareholders. Wutherich testified that he never told anyone that Ajayi's relationship needed to be disclosed in an SEC filing, and he proffers no evidence that he intended to convey such concerns here. ECF No. 79-1 at 111, 85:11-15.

With respect to the "specific conduct" that he did report, Wutherich believed it was "wrong" to use Silver Creek for certain services, because there were other vendors that were better. ECF No. 79-1 at 129, 225:1-8, 228:10-22. He testified that he conveyed this belief, and that he insinuated with his body language that Silver Creek was chosen because of Ajayi's relationship. Id. at 129-30 228:1-231:2. However, he testified that he did not believe this conduct was illegal. Id. at 128-129, 224:24-225:1. As such, there is no evidence that Wutherich reported specific conduct that he reasonably believed to be illegal, let alone conduct that violated one of the specifically enumerated provisions of Section 806. Therefore, the Court should find that Wutherich does not satisfy the first element of his *prima facie* case with respect to the Silver Creek communications.

**(b)  Rice's knowledge**

With respect to the second element of a *prima facie* case, Wutherich must show that Rice knew or suspected that he engaged in protected activity.  In its Motion for Summary Judgment, Rice contends that Wutherich cannot satisfy this element because he did not convey his disagreement over using Silver Creek as a SOX violation.  Rice argues that Wutherich simply "insinuated that [Silver Creek was selected] because of [Ajayi's] relationship with Silver Creek" through his "body language," but he did not tell anyone that he thought it was a securities violation or that it needed to be disclosed in an SEC filing.  ECF No. 76 at 20.  Although Wutherich is claiming that Rice should have disclosed the conflict with shareholders, it argues, he said no such thing at the time.  Id.  Moreover, Rice argues that Wutherich fails to show that the decisionmaker with respect to his termination, CEO Daniel Rice, had any knowledge of the purported protected activity.  Id. at 20-21.

In his Brief in Opposition, Wutherich claims that he satisfies this element of his claim, because he reported to individuals with supervisory authority over him, Ajayi and Toby Rice.  ECF No. 83 at 14-15.  He argues that Toby Rice knew he was reporting on a "conflict of interest" because (1) Toby Rice admitted in his deposition testimony that Ajayi had a known conflict of interest; and (2) in response to an October 3, 2016 email from Wutherich asking whether the Silver Creek price should be locked in, Toby Rice responded that "we are not able to lock in as long as there are conflicts.  Bruce [Jenkins] will provide the ok."  Id. at 9.

Pursuant to 18 U.S.C. § 1514A, a plaintiff reporting internally must report to "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)."  18 U.S.C. § 1514A (a)(1)(C).  Here, Wutherich reported to a person with supervisory authority over him, Ajayi.  To

the extent Rice argues that Wutherich must show "that the decision-makers who subjected him to the adverse action were aware of the protected activity," the decision that Rice relies upon does not stand for this proposition.  ECF No. 76 at 21 (citing Rudolph v. Nat'l R.R. Passenger Corp., No. 2009-FRS-015, 2013 WL 1385560, at *9 (U.S. Dept. of Labor March 29, 2013)).   In Rudolph, the quoted text that Rice relies upon refers to the Administrative Law Judge's ("ALJ") findings regarding the proof of causation element of plaintiff's *prima facie* case, as opposed to proving knowledge of the respondent.  Moreover, the Administrative Review Board found that the ALJ committed reversible error by failing to consider the totality of the circumstantial evidence related to causation, including whether knowledge could be imputed to the decisionmaker based on the knowledge of relevant persons.  Id. at *11.

Nevertheless, even if Wutherich could establish that he engaged in protected activity in the first instance, the record does not support a finding that Rice knew or suspected that he did so.  "In order for an employer to 'know or suspect that the whistleblower-plaintiff is engaged in protected conduct . . . the plaintiff's intra-corporate communications [must] relate in an understandable way to one of the stated provisions of federal law [in § 806].'"  Wiest I, 710 F.3d at 134 (quoting Wiest I, 710 F.3d at 139 (Jordan, J., dissenting)).  Here, Wutherich claims that he reported a potential violation of Rice's failure to disclose Ajayi's relationship with Silver Creek and/or the price lock in shareholders.  However, Wutherich did not refer to Rice's disclosure obligations or its SEC filings in any of his communications.  Nor did he make any other specific statement that would tie his presentation regarding the RFQ process in an "understandable way" to any alleged securities violation.  Wutherich's discussion of pricing and selection of service providers occurred as part of the RFQ process, and he merely "insinuated" Silver Creek was chosen due to Ajayi's relationship through the use of body language.  Absent speculation, a jury

could not reasonably conclude that Rice knew or suspected Wutherich engaged in protected activity, under Section 806, based on his RFQ presentation.

Indeed, Wutherich does not attempt to argue that his communication did, in fact, relate in an understandable way to one of the enumerated laws under Section 806. Instead, he claims that Toby Rice knew that Wutherich reported on a "conflict of interest" based on two statements from Toby Rice—neither of which support this conclusion. First, Wutherich misrepresents an October 3, 2016 email exchange, in which he claims that he "objected to how the award of work had been determined and was pushing for vendors outside of Silvercreek services for some of the work." ECF No. 83 at 9 (citing ECF No. 79-1 at 332). The email does not reflect Wutherich's objection; to the contrary, he asks Toby Rice for approval to move forward with the Silver Creek lock in. ECF No. 79-1 at 332. There is no indication that Toby Rice's response, that "we are not able to lock in as long as there are conflicts," acknowledges any objection raised by Wutherich.

Second, Wutherich refers the Court to testimony from Toby Rice in which he responds "[t]here wasn't an appearance of a conflict. There was a conflict" to counsel's question of whether he "came to the conclusion after Mr. Wutherich's presentation on August 5th, that there was an appearance of a conflict." Id. at 87, 132: 12-16. However, Toby Rice did not testify that he came to this conclusion as a result of the presentation. He continued on to state that "[w]e knew that. We've known that since [Ajayi] disclosed his conflict of interest. The new information from August 10th was we have a robust RFQ, the guys have done their work . . . ." Id. at 132:17-23. Thus, Wutherich does not demonstrate that Toby Rice understood that Wutherich was reporting a "conflict of interest."

Even if Toby Rice did reach this understanding, however, the mere existence of a conflict of interest is not the alleged violation he reported under Section 806. It was common knowledge

that Ajayi had a conflict of interest, and Rice concluded that it was not required to disclose this conflict under Item 404 because Ajayi was not a Section 16 officer.  Id. at 20, 11:18-21; ECF No. 71 ¶ 49.  Wutherich does not show that simply referring to a known conflict of interest would have placed Toby Rice on notice of his purported belief that a securities violation occurred. Accordingly, the Court should find that Wutherich fails to satisfy the second element of his *prima facie* case.

### (c)  Adverse action

Wutherich claims that he suffered an adverse action as a result of his termination.  Rice does not dispute that Wutherich satisfies the third element of his *prima facie* claim.

### (d)  Contributing factor in adverse action

Rice also argues that Wutherich cannot satisfy the fourth element of his *prima facie* case, which requires him to demonstrate sufficient circumstances to "raise the inference that the protected activity was a contributing factor in the adverse action." Wiest I, 710 F.3d at 129.  In support of its Motion for Summary Judgment, Rice argues that Wutherich cannot prove causation because the decisionmaker, CEO Daniel Rice, was not aware of his purported protected activity.  ECF No. 76 at 21.  It further argues that causation cannot be inferred based on temporal proximity because Wutherich was not terminated until approximately two months after the communications at issue.  Id. at 22.  Moreover, it contends that there was a "legitimate intervening event" during this time period as a result of Wutherich's disclosure regarding receiving financial compensation from Drill2Frac and the subsequent investigation.  Id.  Finally, Rice argues that any inference of retaliation is countered by the fact that multiple other Rice employees voiced specific concerns regarding Silver Creek without facing any adverse action. Id.

In his Brief in Opposition, Wutherich argues that his termination was proximate in time to his protected activity, citing ongoing complaints and concerns that arose regarding Silver Creek between the time of his report and termination.  ECF No. 83 at 19-26.  Although these events did not involve Wutherich, he claims that this activity created a "continuous process" and argues that it was only "short time" between his protected activity and termination.  Id. Wutherich argues elsewhere in his brief that Jenkins had "knowledge" of Wutherich's protected activity because Jenkins asked Toby Rice where to find the Silver Creek bidding presentation and had pre-existing knowledge of Ajayi's conflict of interest.  Id. at 28-29.

Upon review, the Court should find that Wutherich fails to satisfy this element of his *prima facie* case.  The causation element of a prima facie case requires allegations that "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action."  Wiest I, 710 F.3d at 129 (quoting 29 C.F.R. § 1980.104(e)(2)(iv)). Further, the United States Court of Appeals for the Third Circuit has held that "a contributing factor [is] any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.  A plaintiff need not provide direct evidence to satisfy this element; rather, circumstantial evidence may be sufficient.  To that end, temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation."  Wiest II, 812 F.3d at 330 (internal citations and quotation marks omitted).

For the reasons discussed above, Wutherich does not demonstrate that he engaged in protected activity, or that Rice knew, or suspected, that he engaged in protected activity.  In the absence of any such activity or knowledge, the circumstances do not "raise the inference that the protected activity was a contributing factor in the adverse action."  Wiest I, 710 F.3d at 129.

Significantly, Wutherich fails to demonstrate any knowledge of his alleged protected activity by the decisionmaker, CEO Daniel Rice, or anyone who could have influenced his decision. Although he argues that Jenkins knew of his protected activity because Jenkins asked Toby Rice where to find the PowerPoint presentation related to the bidding process, he does not point to evidence that (1) Jenkins reviewed the PowerPoint slides; (2) that the slide deck was attributed to Wutherich; or (3) that any content in the slides identifies a potential violation under Section 806. To the contrary, Wutherich testified that he "would have stated *that I disagree with those points* [in the presentation], but in the end, the incumbent [won] . . . ." ECF No. 71 ¶ 57; ECF No. 79-1 at 128, 224:9-19 (emphasis added).

To the extent Wutherich claims that his termination was temporally proximate because intervening complaints or concerns raised by others about Silver Creek created a "continuous process," he cites no legal authority to support this proposition. To the contrary, the fact that Ajayi's conflict of interest was well known and raised by others without adverse consequence in the intervening time period undermines any inference of causation. See, e.g., Wiest II, 812 F.3d at 332 (holding that legitimate intervening events, including lack of knowledge of protected activity by individuals conducting investigation and fact that others who were "as involved, or more involved, in the same activity did not receive any negative treatment" negated any possible inference of causation). Accordingly, construing the facts in the light most favorable to Wutherich, the record does not support a finding that he has satisfied his *prima facie* case with respect to Silver Creek.

### (2) EOG

#### (a) Protected activity

In support of its Motion for Summary Judgment, Rice argues that Wutherich's communications regarding Lo/EOG are not protected activity because he does not even "recall the specifics" of what he said, beyond "that it's illegal, that it's a crime being committed" and something about "the Rice brothers throwing [Lo] under the bus." ECF No. 76 at 12. Even if theft of trade secrets and inducement to share such secrets is illegal, however, Rice argues that such conduct is not per se fraudulent or deceptive, and Wutherich did not frame his communications as a violation of SOX. Id.

Further, Rice argues that Wutherich's after-the-fact theory that Rice's "failure to disclose the illegal nature of its revenue is a securities violation" and the alleged "use of the data was a substantial security risk because of the amount of money involved" is not objectively reasonable and relies on a series of speculative leaps. Id. (citing ECF No. 12 ¶¶ 59-60). Rice argues that Items 103 and 503 of Regulation S-K only required the reporting of pending legal proceedings and "the most significant factors that make the offering speculative or risky," neither of which would have applied in this situation. Id. at 13. Moreover, Wutherich's purported belief that Rice had profited off of Lo and the alleged EOG data is not supported by the record, is purely speculation, and there is no evidence of any threats of litigation arising out of this situation. Id. at 15.

In his Brief in Opposition, Wutherich argues that the "specific words are not important" and that a whistleblower's communication is not required to "ring the bell" on each element of the federal law at issue. ECF No. 83 at 13. Even if the conduct did not "expose the company to extreme financial risk," he argues, a whistleblower can be mistaken. Id. Pursuant to the Third

24

Circuit's decision in <u>Wiest I</u>, he argues, a whistleblower is only required to show that the communications relate in an "understandable way" to one of the provisions under Section 806, and he is entitled to protection even if he does not assert all elements of a fraud claim and/or reports a violation that has not yet occurred.  <u>Id.</u> at 11-13.[7]

Upon review, Wutherich's communications regarding the EOG data also fail to constitute protected activity under Section 806.  SOX is not a "general anti-retaliation statute."  <u>See</u> <u>Gibney v. Evolution Mktg. Research LLC</u>, 25 F. Supp. 3d 741, 748 (E.D. Pa. 2014) (citing <u>Safarian v. Am. DG Energy Inc.</u>, No. 10-6082, 2014 WL 1744989, at *5 (D.N.J. April 29, 2019)).  The protected activity must "relate to one of the six specified categories" under Section 806, and "it does not extend protection to every employee complaint about possible improper or even illegal conduct."  <u>Northrop Grumman Sys. Corp. v. U.S. Dep't of Labor, Admin. Review Bd.</u>, 927 F.3d 226, 229 (4th Cir. 2019).

Although Wutherich argues that Lo's alleged data theft was a "litigation risk"[8] to Rice that should have disclosed to shareholders, he cites no evidence demonstrating that Wutherich subjectively believed this.  Wutherich testified that his communications arose out of a rumor he heard regarding a former employee that went to jail for stealing company data.  While he stated that *Lo* could be convicted of a crime, he did not refer to any "litigation risk" to *Rice*.  Wutherich cites no other evidence to establish that he believed Rice faced litigation at this time, let alone

---

[7] With respect to both his Silver Creek and EOG claims, Wutherich argues in the body of his brief that he is a whistleblower under 18 U.S.C. § 1514A(a)(1). In a footnote, he states without further explanation that he is also a whistleblower under subsection (2) because he "told Tunde Ajayi that what Jeff Lo had done is a crime." ECF No. 83 at 10 n. 8.  As discussed *supra*, Note 6, 18 U.S.C. § 1514A(a)(2) relates to individuals that file or cooperate in proceedings that are filed or about to be filed.  Wutherich does not attempt to explain how this subsection arguably applies and does not identify any proceeding at issue.  Accordingly, he does not establish a claim under 18 U.S.C. § 1514A(a)(2).

[8] Wutherich does not specifically respond to which theory of protected activity he is proceeding under in his Brief in Opposition, but only refers to alleged reporting of a "litigation risk" in his separately filed Motion for Partial Summary Judgment and Statement of Facts Viewed in a Light Most Favorably to Defendant.  ECF Nos. 74 and 74-1.

that he believed Rice would be required to disclose this litigation risk, and that it would likely fail to do so.[9]  While Wutherich "may have earnestly believed that he was reporting some form of misconduct," there is nothing in the record demonstrating his belief of any violation of a law under Section 806.  See Sturdivant v. Chem. Waste Mgmt., Inc., No. 7:19-CV-1129-GMB, 2020 WL 1083212, at *5 (N.D. Ala. Mar. 5, 2020).

Even if Wutherich subjectively held such a belief, he does not establish that it was an objectively reasonable belief.  Although Wutherich correctly notes that a reporting employee can be "mistaken," he must nevertheless demonstrate that "a reasonable person with the same training and experience as the employee would believe that the conduct implicated in the employee's communication could rise to the level of a violation of one of the enumerated provisions in Section 806." Wiest I, 710 F.3d at 132.  As Rice argues, "Item 503(c) disclosure is reserved for the 'most significant factors that make the offering speculative or risky,' and not any and all risks . . . ." Howard v. Arconic Inc., 395 F. Supp. 3d 516, 572 (W.D. Pa. 2019).[10] "'Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.'" Id. (quoting City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014)).

Here, Wutherich does not endeavor to show that the law requires Rice to disclose all "litigation risks," or that a person with his level of training and experience would reasonably believe that it did.  Based on the factual information available to Wutherich, a reasonable person

---

[9] The Court notes that, in his separately filed Motion for Partial Summary Judgment, Wutherich claims that he reasonably believed this was a litigation risk because he is a chemical engineer and knows that EOG credits its high density fracturing with higher outputs, that Rice's failure to disclose was inconsistent with his SOX training, and that he observed that Rice disclosed other litigation risks, but not this one.  He does not, however, cite any record evidence to support these statements. Wutherich refers the Court to paragraph 19 of his Statement of Facts Viewed in a Light Most Favorably to Defendant, which improperly fails to include any supporting citation to the record.

[10] On April 2, 2019, following the events at issue, the SEC relocated Item 503(c) to Item 105 of Regulation S-K to streamline disclosure requirements.  See Howard, 395 F. Supp. 3d at 570 n. 15; 17 C.F.R. § 229.105.

would not have believed Lo's purported acquisition of data created one of the most "significant" risk factors for Rice.   Wutherich had no knowledge of the specific content, source, or permissions to use the data; he had no knowledge that Rice would, or did, utilize the data, or how; and no party had threatened litigation against Rice.  Because Wutherich does not establish a subjectively or objectively reasonable belief of a violation under Section 806, he did not engage in protected activity.  Accordingly, he does not satisfy the first element of his *prima facie* case.

### (b) Rice's knowledge

Rice further argues that it did not know or suspect Wutherich engaged in protected activity with respect to the EOG data, and therefore Wutherich does not satisfy the second element of his *prima facie* case.  ECF No. 76 at 18.  Rice argues that Wutherich only recalls stating that "it's illegal, that it's a crime being committed," and he did not tie any alleged illegality to any of the provisions under Section 806, so anyone at Rice could have suspected he was raising a potential securities issue.  Id.  Moreover, it is apparent that Ajayi did not understand the communication to relate to SOX, because he did not follow up or do anything with the information that Wutherich provided.  Id.  To the extent Wutherich claims he opposed certain "science experiments" that Rice conducted, he did not state that his opposition related to the EOG data.  Id. at 18-19.

In his Brief in Opposition, Wutherich argues that Ajayi "knew Kevin Wutherich was speaking out about something wrong but Mr. Ajayi could not do anything about it because Jeff Lo gave the data to one of the Rice brothers, Derek Rice."  ECF No. 83 at 10.  He further argues that he satisfied the statutory requirement by reporting to Ajayi, his supervisor.  Id. at 16.

Even if Wutherich could establish he engaged in protected activity with respect to EOG, the record does not show that Rice knew or suspected that he did.  It is not sufficient for Ajayi to

simply know that Wutherich was "speaking out about something wrong," as Wutherich argues, because SOX is not a general anti-retaliation statute.  Rice must know or suspect that Wutherich reported conduct in violation of one of the enumerated provisions of Section 806.  Here, Wutherich did not identify any specific legal risk to Rice, as opposed Lo, and he did not tie his communication in an understandable way to a securities violation under Section 806.  Thus, the Court should find that Wutherich cannot satisfy the second element of his *prima facie* case.

### (c)  Adverse action

Wutherich claims that he suffered an adverse action as a result of his termination.  Rice does not dispute that Wutherich satisfies the third element of his *prima facie* claim.

### (d)  Causation

With respect to the fourth element, Rice argues that Wutherich also cannot establish circumstances sufficient to give rise to an inference that his alleged protected activity was a contributing factor to his termination.  Rice argues that the decisionmaker, CEO Daniel Rice, could not have known of Wutherich's alleged protected activity.  Wutherich only reported the Lo information to Ajayi, who did not share this information with anyone else.  ECF No. 76 at 20-21.  Moreover, Rice argues, there is not sufficient temporal proximity to infer causation, because Wutherich was not terminated until three months after his alleged protected activity.  Id. at 22.  Finally, it argues that there was a "legitimate intervening event" in the form of Wutherich's subsequent disclosure of receiving financial compensation from Drill2Frac and the investigation that followed.  Id. at 22-23.

In his Brief in Opposition, Wutherich argues that, in combination with the various events described above regarding Wutherich and others raising concerns about Silver Creek, there was a continuous timeline of events demonstrating temporal proximity.  ECF No. 83 at 19-25.

Wutherich goes on to tell a story that is largely unsupported by citations to the record, alleging that Rice's "true purpose of hiring Jeff Lo" was to obtain the EOG data; that this was "concealed" from Wutherich; Lo was transferred out of the completions department and assigned "science projects" to do; and Wutherich and Ajayi were no longer needed for their chemical engineering experience because Rice now had the EOG data, so Ajayi and Wutherich were dismissed and their stock options were redistributed. Id. at 26.

Upon review, construing the evidence in the light most favorable to Wutherich as the nonmoving party, the circumstances do not give rise to an inference that Wutherich's alleged protected activity contributed to his termination. For the reasons discussed above, Wutherich cannot demonstrate that CEO Daniel Rice knew or suspected he engaged in protected activity, as such, it could not have contributed to his termination. Even if Ajayi had knowledge based on Wutherich's report, which is not shown, there is no evidence whatsoever that CEO Rice or anyone that may have influenced his decision had knowledge of Wutherich's communications regarding the EOG data. Moreover, to the extent Wutherich spins a tale about how he and Ajayi were no longer needed after Rice conspired to steal and use the EOG data, this does not tie his protected activity to his dismissal, even if true. If Ajayi was also terminated and did not engage in any protected activity, this does not create any inference of causation.

Moreover, the three-month period of time between his report to Ajayi and his termination, standing alone, does not give rise to an inference of causation. See, e.g., Flaig v. Aladdin Food Mgmt. Servs., LLC, No. 2:12-cv-00839, 2012 WL 5288716, at *5 (W.D. Pa. Oct. 23, 2012) (noting, in context of employment retaliation statutes, that a period of two months or longer is not "unduly suggestive" of causation) (citing Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (superseded by statute on other grounds). Accordingly,

the Court should also find that Wutherich fails to satisfy the causation element of his *prima facie* case.

For the foregoing reasons, viewing the evidence in the light most favorable to Wutherich, he does not establish a *prima facie* case with respect to either his Silver Creek or EOG whistleblowing events under SOX.  Because he cannot meet this burden, it is not necessary for the Court to assess whether Rice can demonstrate it would have taken the same adverse action in the absence of any protected activity.  Therefore, the Court should grant Rice's Motion for Summary Judgment with respect to Count I.

### b.  Age Discrimination Claims (Counts III and V)

Rice also moves for summary judgment with respect to Wutherich's age discrimination claims alleging violations of the ADEA and the PHRA.[11]  In an ADEA lawsuit lacking direct evidence of discrimination, as here, the order of proof mirrors that of a Title VII discrimination action, as described in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).  Plaintiff must first establish a *prima facie* case of age discrimination by proving the following (1) he is forty years or older; (2) he was the subject of an adverse employment action; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee sufficiently younger to support an inference of discriminatory animus.  Id. at 689.  Proof of these facts raises an inference of discrimination, which is given the force and effect of a rebuttable presumption.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).

---

[11] The United States Court of Appeals for the Third Circuit has held that "[t]he same analysis used for ADEA is also applied to PHRA claims." Prewitt v. Walgreens Co., 92 F. Supp. 3d 292, 305 n. 4 (E.D. Pa. 2015) (citing Fasgold v. Justice, 409 F.3d 178, 183-84) (3d Cir. 2005)).  Thus, the portion of Wutherich's PHRA claim pertaining to age discrimination is subsumed in the Court's discussion of his ADEA claim.

Once a *prima facie* case is established, the burden shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action.  Burdine, 450 U.S. at 254; Santiago v. Brooks Range Contract Servs., 618 F. App'x 52, 54-55 (3d Cir. 2015).  "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."  Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (citing Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)).  At this stage, the employer is not required to prove this reason actually motivated its conduct.  Id.

After the employer has met its relatively light burden of articulating a legitimate non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's proffered explanation is pretextual.  Id.  The plaintiff may meet this burden either directly, by persuading the court that the employer's action was more likely motivated by a discriminatory reason, or indirectly, by showing that the employer's proffered explanation is unworthy of credence.  See McDonnell Douglas, 411 U.S. at 804-05.

Throughout this burden-shifting analysis, the ultimate burden of proving intentional discrimination rests with plaintiff.  See Burdine, 450 U.S. at 253-57.  A plaintiff meets this burden if his "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).

### (1)  *Prima facie* **case**

For purposes of the present Motion, Rice does not dispute that Wutherich can establish a *prima facie* case of discrimination based on age.  ECF No. 76 at 26.

### (2)  **Legitimate nondiscriminatory reason**

Next, the Court looks to whether Rice proffers a legitimate nondiscriminatory reason for the termination of Wutherich's employment.  Here, Rice asserts that Wutherich was terminated for violating the conflict of interest policy.  In October, 2016, COO Toby Rice instructed all Rice employees to disclose any previously undisclosed conflicts of interest to Jenkins, Rice's Director of Internal Audit.  ECF No. 77 ¶ 39.  In response, on October 17, 2016, Wutherich informed Jenkins by email of his relationship with Drill2Frac and that he was receiving a referral fee for clients contracted with Drill2Frac.  Id. ¶ 40.  Jenkins initiated an investigation, which included review of Wutherich's email inbox and computer hard drive.  Id. ¶ 41.  Jenkins' investigation revealed that Wutherich was contacting representatives of companies like Consol and Range about Drill2Frac.  ECF No. 76 at 26.  Based on the investigation, CEO Daniel Rice, concluded that Wutherich was abusing his role at Rice for personal benefit by using proprietary Rice information related to Rice's trial of Drill2Frac in order to help sell Drill2Frac to Rice's competitors.  Id.  CEO Rice determined that this conduct violated Rice's conflict of interest policy because Wutherich never disclosed that he was being paid financial compensation to refer potential customers to Drill2Frac.  Id.  This reason, taken as true, proffers a legitimate nondiscriminatory reason for terminating Wutherich.[12]  Thus, Rice meets its "relatively light" burden to provide a legitimate non-discriminatory reason for termination.

---

[12] Although Wutherich asserts that Rice fails to present a legitimate non-discriminatory reason, he fails to offer a clear substantive argument regarding this element.  As opposed to briefing this issue under the relevant legal standard, he refers the Court to Section III(A)(2) of his Brief of Opposition, asserting that this section demonstrates that Rice had no legitimate non-discriminatory reason for terminating Plaintiff's employment.  ECF No. 83 at 31.

**(3) Pretext**

At this final stage of the burden-shifting analysis, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual."  Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015).  To meet this burden, a plaintiff must identify evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764. "Regardless of the method, the plaintiff's evidence must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a 'but for' cause of the adverse employment action."  Abels v. DISH Network Service, LLC, 507 F. App'x 178, 183 (3d Cir. 2012).

To establish pretext under the first prong of Fuentes, the plaintiff must do more than "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 765.  Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  Id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).  "If a plaintiff comes forward with evidence that would cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence,' [he] need

---

However, the referenced section focuses only on whether Rice would have terminated Wutherich if he did not engage in protected activity under SOX and does not address whether, taken as true, Rice asserts a legitimate reason for terminating Wutherich that is not based on age discrimination.  See id. at 27-29.  To the extent Wutherich seeks judgment in his favor on this issue in his separately filed Motion for Partial Summary Judgment, he also does not include any substantive argument and refers the Court back to unspecified "reasons stated above." ECF No. 74 at 15.

not adduce any evidence of discrimination beyond [his] prima facie case to survive summary judgment." Burton, 707 F.3d at 430 (quoting Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 310 (3d Cir. 2012)).

Under the second prong of Fuentes, a plaintiff may establish pretext "by presenting evidence 'with sufficient probative force' so as to allow the factfinder to 'conclude by a preponderance of the evidence that age was a motivating or determinative factor.'" Willis, 808 F.3d at 645 (quoting Simpson v. Kay Jewelers, 142 F.3d 639, 644-45 (3d Cir. 1998)). This proof may consist of evidence that: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." Id.

With respect to the first prong, Rice argues in support of its Motion for Summary Judgment that Wutherich has done nothing to cast its stated reason for his termination into doubt. ECF No. 76 at 27. At most, it argues, Wutherich believes that Rice made the wrong decision in terminating him, which is insufficient to prove pretext. Id. With respect to the second prong, Rice argues that Wutherich also fails to show that age motivated its decision. Rice argues that any effort to rely upon Didier as a comparator is unavailing, because Didier is approximately three years younger than Wutherich, and an age difference of less than four years, alone, does not support an inference of age discrimination. Id. at 28 (citing Innella v. Lenape Valley Found, No. 14-2862, 2014 WL 3109973 (E.D. Pa. July 8, 2014)). Moreover, Rice argues that Didier is not similarly situated to Wutherich because, unlike Wutherich, Didier fully disclosed his conflict of interest to Rice. Rice further asserts that its decision to terminate Ajayi, a younger employee (and Wutherich's supervisor), for failing to disclose a conflict on the same day as Wutherich, belies any suggestion of age discrimination.

In his Brief in Opposition, Wutherich argues that Didier had a conflict of interest because he owned Silver Creek stock and reviewed invoices. ECF No. 83 at 25. He states that Didier was younger than Wutherich and was permitted to resign with vested stock benefits, while Wutherich was not. Id. [13]

Upon review, Wutherich fails to meet his burden to establish pretext. Although Wutherich does not frame his argument pursuant to the relevant legal standard, he appears to be arguing that he has satisfied the second prong of Fuentes. Under the second prong of Fuentes, plaintiff may rely on evidence that the employer has treated similarly situated, substantially younger individuals more favorably. See Willis, 808 F.3d at 645. In order to be "similarly situated," a comparator employee must be "similarly situated in all relevant respects," considering factors such as the employees' job responsibilities, supervisors and decisionmakers, and the nature of the misconduct at issue. Wilcher v. Postmaster General, 441 F. App'x 879, 882 (3d Cir. 2011).

Here, Wutherich fails to establish that the only potential comparator he identifies, Didier, was similarly situated and substantially younger. [14] In considering whether the two were similarly situated, Wutherich was dismissed because he failed to disclose his financial relationship with Drill2Frac and Rice's investigation found that Wutherich used Rice's

---

[13] Without including any substantive legal argument regarding pretext, Wutherich broadly refers the Court to his argument in Sections III(A)(2) and III(A)(1)(c) of his Brief in Opposition, but these sections pertain to his SOX claim and do not respond to whether the reasons given for his termination are pretext for age discrimination. ECF No. 83 at 31. He further refers the Court to his Motion for Partial Summary Judgment in its entirety. Id. In his Motion for Partial Summary Judgment, however, he does not seek judgment in his favor with respect to the issue of pretext, and he does not address it in his brief. It is not clear to the Court to what Wutherich is specifically referring and whether or how he claims it establishes pretext under the relevant legal standard.

[14] Although Wutherich does not brief this issue, he asserts that Toby Rice held "several private functions at his personal residence" and that Wutherich was not invited under the subheading "age and nationality discrimination" in his Statement of Facts Viewed in a Light Most Favorably to Defendant. ECF No. 74-1 ¶¶ 24-25. Wutherich does not provide a cite to the record in support of his statement that he was not invited to these functions. See id. Moreover, he does not proffer any evidence to suggest he was not included because of his age and/or nationality. Accordingly, this evidence does not tend to establish pretext.

proprietary information to Drill2Frac's benefit.  The contents of Wutherich's email inbox and hard drive revealed that he was contacting other energy companies regarding Drill2Frac.  ECF No. 77 ¶ 42.  Didier is not similarly situated in all relevant respects, because he had disclosed his partial ownership in Silver Creek to Rice and Rice encouraged him to sell his ownership. Instead, Didier resigned his employment from Rice.  Id. ¶¶ 64 - 67.  Wutherich also does not identify any evidence that Didier used Rice's proprietary information for Silver Creek's benefit, or that Didier engaged in other similar alleged misconduct to Wutherich.  Further, Wutherich presents no evidence that he and Didier held comparable positions at Rice.

As to age, "[t]he Third Circuit has consistently held an age difference of less four years, alone, does not support an inference of age discrimination."  Innella, 2014 WL 3109973, at *4 n. 2.  Because Didier is only approximately three years younger than Wutherich, he is not sufficiently younger to permit an inference of age discrimination.

Accordingly, construing the evidence in the light most favorable to Wutherich as the nonmoving party, he has not met his burden to show pretext as required by Fuentes.  Wutherich does not present sufficient evidence from which a reasonable jury could find that Rice's articulated reason for termination of Wutherich's employment was pretext for age discrimination.  Therefore, the Court should grant summary judgment as to Wutherich's claims of age discrimination in Counts III and V.

### c.  National Origin Discrimination Claims (Counts IV and V)

Rice also moves for summary judgment with respect to Wutherich's national origin discrimination claims pursuant to Title VII and the PHRA.[15]   These national origin

---

[15]  The United States Court of Appeals for the Third Circuit has held that PHRA claims can be treated coextensively with Title VII claims.  See Young v. Management of J.C. Penney's Co., 169 F. App'x 675, 677 (3d Cir. 2006) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).  Thus, the portion of Wutherich's PHRA claim pertaining to national origin discrimination is subsumed in the Court's discussion of his Title VII claim.

discrimination claims must be analyzed pursuant to the <u>McDonnell Douglas</u> burden-shifting framework, described above. <u>Vuong v. Mgmt. of J.C. Penney's Co.</u>, 169 F. App'x 675, 677 (3d Cir. 2006). Assuming that Wutherich establishes a *prima facie* case of national origin discrimination, the burden shifts to Rice to state a legitimate non-discriminatory reason for termination of Wutherich's employment. <u>Id.</u> If Rice satisfies its burden, the burden then shifts back to the Wutherich to show by a preponderance of the evidence that Rice's proffered reason is pretextual.

### (1)  *Prima facie* **case**

For purposes of the present Motion for Summary Judgment, Rice does not dispute that Wutherich can establish his *prima facie* case of discrimination based on national origin.

### (2)  **Legitimate nondiscriminatory reason**

With respect to whether Rice has presented a legitimate nondiscriminatory reason for the termination of Wutherich's employment, Rice relies upon the same stated reason provided as to Wutherich's age discrimination claims, *supra* at 32. <u>See</u> ECF No. 76 at 20; ECF No. at 31.  For the reasons set forth above, Rice has satisfied its burden to proffer a legitimate nondiscriminatory reason for Wutherich's termination. <u>See</u> *supra* at 32.

### (3)  **Pretext**

In its Motion for Summary Judgment and accompanying brief, Rice argues that Wutherich cannot establish pretext for his national origin discrimination claims largely for the same reasons that he cannot do so with respect to his age discrimination claims. ECF No. 76 at 27-29. Specifically, under the first prong of <u>Fuentes</u>, Rice argues that Wutherich does not cast the legitimate nondiscriminatory reason into doubt, and at most, he believes that Rice made a wrong decision in terminating him. Under the second prong, Rice argues that Didier is not

similarly situated to Wutherich and any inference of national origin discrimination is countered by the fact that Rice terminated Ajayi, an American (and Wutherich's supervisor), for the same conduct on the same day as Wutherich.  Further, Ajayi was replaced by a Canadian.  Id.

In his Brief in Opposition, Wutherich relies upon the same response with respect to his age and national origin discrimination claims.  ECF No. 83 at 31.  He argues that Didier, an American, had a conflict because he owned Silver Creek stock and reviewed the invoices.  Id.  Didier resigned and received vested stock benefits, while Wutherich did not.  Id.

Again, as recognized above, Didier and Wutherich were not similarly situated.  In considering whether the two were similarly situated, Wutherich was dismissed because he failed to disclose his financial relationship with Drill2Frac and Rice's investigation found that Wutherich used Rice's proprietary information to Drill2Frac's benefit.  The contents of Wutherich's email inbox and hard drive revealed that he was contacting other energy companies regarding Drill2Frac.  ECF No. 77 ¶ 42.  Didier is not similarly situated in all relevant respects, because he had disclosed his partial ownership in Silver Creek to Rice and Rice encouraged him to sell his ownership.  Instead, Didier resigned his employment with Rice.  Id. ¶¶ 64 - 67.  Wutherich also does not identify any evidence that Didier used Rice's proprietary information for Silver Creek's benefit, or that Didier engaged in other similar alleged misconduct to Wutherich.  Further, Wutherich presents no evidence that he and Didier held comparable positions at Rice.

As to national origin, the Court notes that prior to their terminations, Wutherich, a Canadian, held the position of Director of Completions, reporting to Ajayi, an American, holding the position of Vice President of Completions.  CEO Daniel Rice terminated the employment of

Wutherich and Ajayi on the same day for conflict of interest violations.  Wutherich was replaced by an American.  Ajayi was replaced by a Canadian.  Id. ¶¶ 61-62.

Upon review, Wutherich does not establish pretext with respect to his claims for national origin discrimination.  As previously discussed, Didier is not a substantially similar comparator, and therefore evidence that he was allegedly treated more favorably than Wutherich does not tend to establish pretext.  The closest possible comparator is Ajayi, an American, who was terminated the same day as Wutherich, for similar conflicts of interest violations, and Ajayi was replaced by a Canadian.  Again, construing the evidence in the light most favorable to Wutherich as the nonmoving party, he fails to present sufficient evidence from which a reasonable jury could find that Rice's proffered reason for Wutherich's termination was pretext for national origin discrimination.  Accordingly, the Court should also grant Rice's Motion for Summary Judgment with respect to the claims of national origin discrimination in Count IV and the remaining portion of Count V.

### 2.  Wutherich's Motion for Partial Summary Judgment

Wutherich seeks partial judgment in his favor on four issues.  With respect to his SOX claim, he requests a finding that (1) he has proven a *prima facie* claim of whistleblower retaliation; and (2) Rice has failed to meet its burden to present clear and convincing evidence of a legitimate non-discriminatory reason for discharge.  ECF No. 73 ¶¶ (a)-(b).  With respect to his age and national origin discrimination claims, he requests a finding that (1) he has proven a *prima facie* case of age and national origin discrimination; and (2) Rice has failed to offer a legitimate non-discriminatory justification for the adverse employment action.  Id. ¶¶ (c)-(d).

Because we recommend above that Rice's Motion for Summary Judgment be granted with respect to all remaining claims, Wutherich's Motion for Partial Summary Judgment should be denied.

### D.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that Rice's Motion for Summary Judgment as to Counts I, III, IV and V of the Amended Complaint, ECF No. 75, be granted.  It is further recommended that Wutherich's Motion for Partial Summary Judgment, ECF No. 73, be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.  Failure to timely file objections will waive the right to appeal.  Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011).  Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.


Dated: May 5, 2020

Respectfully submitted,


*/s/ Maureen P. Kelly*
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE



cc:    The Honorable Cathy Bissoon
       United States District Judge

       All counsel of record via CM/ECF

40